## J. E. BURNS *et al.* v. STATE.

No. A-2936.   Opinion Filed Aug. 5, 1919.

(182 Pac. 738.)

(Syllabus.)

1.   **LEWDNESS—Living in State  of Adultery—Elements of Offense —"Open and Notorious Adultery."**   Having occasional illicit intercourse, without a public or notorious living together, is not sufficient to constitute the offense of living in a state of open and notorious adultery. To constitute  "open and notorious adultery," the parties must reside together publicly, in the face of society, as if the conjugal relation existed between them.

2.   **SAME—Evidence—Sufficiency.** Evidence examined and considered, and **held** insufficient to support a conviction of defendants of the crime of living together in open and notorious adultery.

*Appeal from District Court, Jefferson County;*

*Cham Jones, Judge.*

J. E. Burns and Lula Bond were jointly tried and convicted of the crime of living in open and  notorious  adultery, and sentenced to pay fines of $350 and $250, respectively, and each appeals.   Judgments reversed.

*Guy Green,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

MATSON, J.   This is an appeal from the district court of Jefferson county, wherein plaintiffs in error, J. E. Burns and Lula Bond, were convicted of living together in open and notorious adultery, and their punishment fixed at fines of $350 and $250, respectively.   From such judgments of conviction each has appealed, and among other grounds assigned as reasons for reversal is that the evi-

dence wholly fails to support a conviction of living together in open and notorious adultery within the meaning of the Oklahoma statute defining said crime and the decisions of this court construing the same.

This prosecution was founded upon an indictment returned by the grand jury of Jefferson county which charged the said defendants with living together in open and notorious adultery. The court in instructing the jury limited its consideration to the guilt of the defendants of the crime of living together in open and notorious adultery. The verdicts of the jury found each defendant guilty of the crime charged in the indictment, and upon such verdicts the court pronounced judgments of conviction against each of the defendants of the crime of living together in open and notorious adultery.

While the evidence discloses that the husband of the defendant Bond appeared before the grand jury, and that it was through and by his efforts that this indictment was returned against the parties to the crime, so that it could properly have been held that the prosecution was commenced and carried on against these parties by the husband of one of the defendants, so that a conviction of ordinary adultery as distinguished from open and notorious adultery would have been permissible under the charge and the evidence, yet, because the court did not submit that issue for the consideration of the jury, this court is limited in considering the evidence to the sufficiency of the same to support a conviction of the crime of living together in open and notorious adultery.

Before proceeding to a consideration of the evidence of the state's witnesses upon which reliance is based to support this conviction, it is appropriate to call attention

to certain definitions of the crime of "open and notorious adultery" heretofore given by this court. In *Copeland v. State,* 10 Okla. Cr. 1, 133 Pac. 258, it was held:

"To constitute living together in open and notorious adultery the parties must reside together publicly, in the face of society, as if the conjugal relation existed between them, and their illicit intercourse must be habitual."

In *Kitchens v. State,* 10 Okla. Cr. 603, 140 Pac. 619, while it is held that it is not necessary that the parties claim to be husband and wife if they live together in the same house in the familiar manner of husband and wife, yet, in order to constitute the offense of living together in open and notorious adultery, it is necessary that their lewd and lascivious cohabitation and conduct be open and notorious. In the latter case a reading of the statement of facts discloses that the parties convicted lived together in the same house by themselves, and that their conduct was lewd and lascivious, and that several witnesses saw the parties in compromising positions and taking indecent liberties with the persons of each other.

In the case of *Spencer v. State,* 14 Okla. Cr. 178, 169 Pac. 270, L. R. A. 1918F, 592, where the evidence was held sufficient to support a conviction of living together in open and notorious adultery, the facts show that the convicted parties, although unmarried, lived together in the same house as husband and wife, and that such relationship continued for a prolonged length of time even after it became generally known in the community that the parties were not married to each other.

In the recent case of *Barber et al. v. State,* 15 Okla. Cr. 558, 179 Pac. 790, wherein it was held that the evidence was insufficient to sustain a conviction of living to-

gether in open and notorious adultery, the facts are not dissimilar to those in this case. In that case it was also held:

"To constitute 'living in open and notorious adultery,' under the statute, there must be something more than occasional illicit intercourse indulged in; the parties must reside together publicly in the face of society, as if conjugal relations existed between them, and their so living must become generally known in the community in which they live."

In substance the evidence relied upon to support the conviction in this case is about as follows:

G. M. Bond testified in part:

"I reside at present in this county out east of Addington with my son. I am a married man, and know the defendant Lula Bond. She is my wife. We were married to each other in Dallas, Tex., in May, 1893, about 23 years ago now. I have never been divorced from Lula Bond, and she and I have remained husband and wife from the date of our marriage to this time. We went to the place where Mrs. Bond lives now the second year after we came to Oklahoma, and for two years we lived over there where Mrs. Bond now lives on the Grove land; that is right on the banks of Red River, and about 3½ miles southeast of Terral, Jefferson county, Okla. She and I went away from Oklahoma to Baltimore, Md., and we were there when President Wilson was inaugurated, and then she came back home a month before I did, and this was just a month before my litle daughter graduated in May at Dallas, Tex., which would make it about the year 1913, and four years ago next month. Wife wrote me a great many letters. In every letter I would get from her she told me not to hurry home, but to stay and have my visit out. After I came home I had a conversation with her relative to her conduct. She told me she had been in the pasture five or six miles from home with Mr. Burns and had stayed there with him nearly all day. I then told her the character that Burns

had, how he stood in regard to morality. Well, she told me she had been out riding with him, and what she said to him was in response to what I had said to her. I remonstrated with her for six months about Burns. The only reason she ever gave for riding around at night with him was that she was trying to reform him. Never did she, but one time, agree that she would quit going with him. I had to go over to Ardmore on some business, and when I came back off the trip she told me she had a dance the night before, and that Burns was there, and that the next day was Sunday, and that she and Burns had gone out to the pasture again. She and I have been separated about two years, and on that separation I gave her very near all the property I had. Burns separated from his wife a little after I separated from mine, about two years ago. I don't know where he lived after his separation from his wife only from hearsay, but I have seen him at the house of my wife. On our separation my wife kept our home place. I supposed on seeing him there that he was in charge of the place, but her brother was living there at the same time. The first time I talked with her about associating with Burns was just after I returned home, after President Wilson's inauguration. After I came back here she told me she had been out with Burns. This was the first time I had ever known of her associating with him. She and I drew up our papers of separation about two years ago. I didn't see her riding around with Burns, and have only what she told me about it. After I had remonstrated with her she wouldn't live in the same room or occupy the same room with me, refused to sleep with me, and in fact would not have anything to do with me at all. After she and I had got to occupying separate rooms she was out several nights, repeatedly coming in at 2 or 3 o'clock, and she said she was out with her friends. One night she didn't come in at all. I only know from hearsay where she was. She said it was none of my damn business."

Curtis Ramsey:

"I live at Terral, Okla., and know the defendants, and have known them several years. I know where Mr. Bond's place is and I lived there last year, and rented the place from Mrs. Bond, I mean for 1915, but I left there in the early part of the spring.    Mrs. Bond lived there when I did, and so did the defendant Burns.    I was renting the place.    Mr. Burns was boarding with me, and Mrs. Bond boarded with me a part of the time, besides having two rooms of the house for her own use, and she did her cooking in these rooms.    (Here witness shows the rooms occupied by Mrs. Bond, and by Burns on the map.) One could go from Burns' room to Mrs. Bond's room without going through any of the balance of the house.    Mrs. Bond was boarding with me  when  Burns  came  there. Burns had bought a stalk field, and his cattle were all around the house, and he had to move there with me to take care of the cattle.   He didn't stay there all the time. He had some cattle in another place also.    After he came there she began to use the cook room and to cook for herself.    Burns slept in this room adjoining my dining room. If he had been going to her room while they were boarding there with me, I would have run him off; and I never saw any improper conduct between them, or any thing out of the way, and if they lived in adultery I didn't know it. Burns not only had the stalk field but had the grazing of the wheat field.    The reason I left the place some one shot through the window, and my wife is of such a nervous disposition that I didn't want to stay there any longer with bullets flying around.    I believed after I left there Mrs. Bond went over to Mr. Towel's and stayed a part of the time, and a part of the time she stayed at Mr. Musick; then after this she went away and stayed away, and I didn't see her any more until this summer.    Her brother came here and took charge of the place.    I saw the outline of the fellow who shot in the window, and we measured track, and I picked up the bullet after him, and I have it yet.    I am brother-in-law of the defendant Burns.    While we were there I saw Burns in Mrs. Bond's bedroom.    He would

walk in and speak to her, and then walk out. I never saw them go away from the house together often; sometimes they would go away on business, would go over to the field to see the cattle, and they went in plain, open daylight. I don't think I ever saw them out together at night but one time. They went to Mr. Bailey's one night, and stayed until about 10 o'clock and returned."

I. F. Tillman:

"I live 6⅖ miles northeast of Terral, Okla., and have known the defendant for four years. I live in about six miles of Mrs. Bond's house. I don't know about Burns staying around her place after she and her husband separated, but I have seen the two defendants together, sometimes two or three times a week. They would pass my house together sometimes, going east of my house. They were going down to the pasture, in some places in the pasture there were thickets, some open. I recall seeing them going down there one Saturday afternoon, but I didn't see which way they went out. Then I recall seeing them go west just after night, after dark, traveling horseback, each riding a separate horse. Then I saw them again one night with some other parties after dark, riding horseback. For awhile I saw them together two or three times a week. I saw them driving cows by there some. At one time they drove a bunch of cattle by, and he cut one out for me, but I believe Mrs. Bond's daughter was with them that time. The most of the time I saw them pass they were alone, only with each other. That was two years ago last spring that I saw them driving the cattle. I have seen them also along with others, and I have seen Mrs. Bond without Burns being along."

Albert McKinley:

"I live at Terral, Okla., and live in town. Mrs. Bond lives down the river. I know her, and also defendant Burns. I saw them together over in Texas at a cafe there in Nocona. They were there at supper, and it was after dark. There

was a girl with them, and they were eating supper. Mrs. Bond introduced me to the young lady, and asked me to come to see her; that she was visiting her. I have been living at Terral since 1901. Have been to Mrs. Bond's house. This Nocona trip was the first thing I ever saw of that kind."

J. O. Linton:

"I live in three-fourths of a mile of Mrs. Bond's house, and there is a road that goes straight through to her place and by my house. There is a gate there, but it stands open. I remember when Mr. Bond and his wife separated, and also the time when Burns and his wife separated. Up to the time of these separations I don't remember that I saw Burns at the Bond house, but I have seen him going and coming from the Bond place. Judge Bond seems to have been in Washington at the time. I have seen Burns going and coming from there for a year or better before the separation of the Bonds. I don't know who was living with Mrs. Bond at the time. Mrs. Bond had some children, and they were at home part of the time and part of the time they were in school. I have seen Burns both coming and going while they were in school and while they were at home. I saw Judge Bond pass in a buggy going to town. Probably an hour after that Burns came along going in that direction, and then I saw him come from there, and he came on through the gate and left the road, and Burns came on and cut the horse off. This was in the springtime, and I went over there to get a mess of greens on one occasion, and I saw Burns' horse tied there behind the orchard, and I went on and went down to Bob Eddleman's, and after a little Burns came along. I had seen him go towards Judge Bond's that morning. If there was any one staying there with Mrs. Bond, I don't know it. I think he stayed there at the Bond place an hour and a half or two hours between the time I saw him and then saw him come away. On another occasion I and Wes Young, a constable, went by the Bond house one night, and he wanted to see Burns. I had seen Burns riding a grey mare that morning, and on getting over there that

night in the dark Young flashed his light, and there was the mare that Burns had been riding that morning. I refused to go in the house. I told Young I wouldn't go. It was some 8 or 9 o'clock in the night. At that time Judge Bond was either in Oklahoma City or up at one of his sons. I have seen the two defendants pass my house after night riding, and I have met them time or two after night. I have seen them ride together heaps, a right smart. But I have seen her ride with others also. I have seen Mrs. Bond riding over the farm there looking after her cattle a heap of times, and I have seen her driving cattle. I thought no more of that than I would of any other lady. Burns had a farm down the country there which was his own, and he passed my house a great deal, for the road that ran by my house led to his farm on the river; at least that was one way to go to it. I have seen him and Mrs. Bond together driving cattle and I have seen them driving with others. The horse I saw tied that night was tied in front of the house. At least it looked like his horse. That night Wes Young wanted to find out if Burns was over there. There was a light in the house when we were there, in one room. We found the horse, and I told Young I wouldn't go in, and neither of us went in. I don't know who was in there, nor how many, nor whether Burns was in there or not, nor whether Mrs. Bond was in there or not. I have noticed her riding with Burns when they were driving cattle and when they were not. Why, she has ridden with me, and I thought nothing wrong of it at the time, and as to that I never saw anything wrong with her in my life. She was as nice a lady as I ever saw."

Tom Cochran:

"I live in about seven miles of Mrs. Bond's place and in the Fleetwood community. Before that I moved to the Fleetwood community I lived within a half or three-fourths of a mile of her. In the pasture country down there there is one rough hollow with thickets and brush, and when you get to the river country south of there there are thickets and all

sorts of brush.   I have known these defendants to stop at
my house, and in going back to Terral to go around through
the river bottom.   One evening I was down there in the
pasture late after a cow, and I saw two horses hitched, and
one of them was Burns' horse. I got off my horse and walked
down a little slough a little piece; then I turned and walked
back.   I didn't see either of the defendants, but I just saw
the horses.   Then I saw them get on their horses and ride
off.   I didn't see the parties in the thicket.   I was not close
enough to see that.   The horses were tied at the edge of the
thicket.   I saw the defendants ride away on their horses.   It
was about 30 minutes from the time that I saw them ride
away together, or it might not have been that long.   This
was some time in the summer of 1914.   They both had cattle
down there, and would come by my house to look after them,
and would stop nearly every time they came that way. At
the time I saw their horses hitched I was within 100 yards
of them.   I just saw the two horses standing there, and got
within 100 yards of them.   I have known their [Bonds']
little girl to come to the pasture with them a time or two, and
one evening when they wanted to leave her pony was lame,
and the little girl commenced crying and asked her mother
why she wanted to go around through the bottom to get
back to Terral.   George Tombs was along with them that
evening, and Mrs. Bond and Mr. Burns rode off ahead of
them, and Tombs looked after the horse's foot, and he and
the little girl rode on behind them a half an hour, and I
don't know whether they overtook them or not.   Burns and
Mrs. Bond left 30 minutes ahead.   Tombs worked on the
pony's foot, and I thought he was a little long about it too.
I and Burns are not on good terms.   The route that Mrs.
Bond and Burns took to Terral made it about three miles
farther to get to Terral than to go the public highway, and
the little girl cried, and didn't want to go the long way, and
didn't start for some time after they did.   Their road car-
ried them through the bottom.   At the time I saw the horses
hitched at the edge of the thicket I don't know where Mr.
Bond was."

### Cephus Bingham:

"I am the son of Walker Bingham, and we live in about a half a mile of Mrs. Bond. I am 14 years old, and am in the fourth grade of school. I was at Mrs. Bond's house last year looking for a mule, it was last fall, and papa told me to go in and see if Mrs. Bond had seen the mule. I did so, and when I went in she and Mr. Burns were in there eating breakfast together, and it was about 9 o'clock. He didn't have any shoes on, but was in his sock feet. He came to the door when I knocked and let me in. She sat at the end of the table and he at the side. I was never a witness in a case before. I don't know exactly what time it was last fall that I saw this. Don't know what month; never tried to keep up with the months. We got through picking cotton last year about three months before Christmas, and turned the mule out. We were wanting to break 40 acres of Mrs. Bond's land, and I was hunting the mule that morning."

### P. G. Eddleman:

"Last year I lived on Mrs. Colbert's place, about half a mile from my house to Mrs. Bond's, and I remember when it was announced that Mr. and Mrs. Bond had separated, and also I heard when Burns and his wife separated, but I don't know which separation occurred first. I won't swear that Mr. Burns ever went to Mrs. Bond's place to live, as I didn't stay up there myself, but I saw the two together. I know I saw them one time, just them two, and I saw them several times with other people along. They came to my house one night together; then they passed my house coming in from the south together. That road running east from my house goes as far as you want to go, and it runs through a broken land of hills and hollows. The night I saw them together it was about 9:30 o'clock, and we followed the horse tracks of the defendants next morning, and saw where they had stopped under a pecan tree during the rain, and saw where the horses were tied to a bush out to one side of the tree, and where the grass was sorter mashed down there, and they were the same tracks of the horses

that we had tracked. I haven't seen them riding together since that time. I had gone down early in the morning and saw they went down there, but didn't go down to where they were tied until next evening when I followed the tracks down. It was about half a mile from my house to where these tracks led and about half a mile to Mrs. Bond's, and this is the closest house to mine."

A. A. Stevenson:

"I live a couple of miles from Mrs. Bond's house, and know the defendants. I have seen them riding together, and on one occasion they went down the road that evening before night, and there was a man and woman stopped at the corner of my yard that night talking. One of these went north, and the other went west. The defendants had come down going east. Burns was riding a grey horse, and Mrs. Bond was riding a sorrel white-faced horse, and the man and woman that come on that night were riding these kind of horses. When I heard them talking that night, I raised the window. They were about 60 feet away, I guess, but I couldn't understand what they were saying. I heard the man say, 'I guess it will be the best to separate here,' or rather she said that. This was about 9 o'clock. The man was riding a grey horse and the woman a sorrel, but I couldn't fully recognize the parties, though it was a moonlight night. I could see the white face of the horse the lady rode. This was in the summer over two years ago that I saw these two persons talking. I suppose that Mr. Bond was at home then, but I hadn't heard of him and his wife separating. I never was around them much."

Lula Ramsey, for defendant, testified in part:

"The defendant Ellison Burns is my brother, and I know Mrs. Bond. I had rented her place where she lived, and was there September a year ago. She continued to live there, but not very long. She didn't stay with us all the time even while she made her home there, but was away part of the time. She kept two rooms to live in herself. She boarded with us when we first went there, but afterwards

she cooked in her own room. My brother, J. E. Burns, came there late in the fall to stay, and boarded with us, and kept his stock there. I remember when the Bingham boy came up there to ask about a mule, and at the time I and my brother were in the room, and we were eating breakfast. My husband, Curtis, was not there that morning. My brother had some cattle there, and he stayed there a part of the time. My husband made the contract for renting the place, and we moved there in September. We had been there quite a while before Burns came there. My brother at that time was living at Terral, and we lived on the Bond place seven or eight months. Husband had rented the stalk field from Mrs. Bond. I have just one child. I would go up to Terral sometimes and stay all night with my mother. I don't know what was occurring at home while I was gone. Mrs. Bond owned and kept cattle at that time. My brother just came there and boarded with us for a part of the time we lived there, and he paid us for his board, and we lived there seven or eight months in all."

Hugh Barber:

"I am 16 years old. I know Mrs. Bond and Ellison Burns and I have been about Mrs. Bond's a good deal, and have gone with her and Mr. Burns looking after stock. Mr. Bond has asked me sometimes to go and help with the cattle, and the cattle would sometimes be out on the prairie, and sometimes in the stalk field around home. Mrs. Bond looked after the farm and stock. I have seen her looking after her cattle, and Mr. Burns was with her. I have seen Judge Bond saddle her horse for her. They were all getting along peacefully then, and he would ask me to go and help with the stock. I don't recollect the number of times I went. I remember when he went back East, and when she went with him. I don't remember of her ever asking me to go with them to look after the stock, but Mr. Bond and Mr. Burns both asked me. Nor do I remember how many times I helped them with the stock after Mr. Burns moved to the Bond place. After that Burns would always ask me to go

along. I and the girls, when they went, would ride along to-gether."

John Towel:

"Prior to two years ago I lived on Mrs. Bond's place, and I lived there six years. They had a few cattle, mules, and hogs, and Mrs. Bond looked after them, and sometimes I did. They kept some of them on the place there, and I don't know where they kept the others. Mr. Burns helped look after them also at Bond's solicitation. I recall one time when Burns helped brand the stock and dehorn the cattle. I don't know about him helping Mrs. Bond look after the cattle, but it was my understanding that they were car-ried over in Burns' pasture one time, and after that had been done I have seen Mrs. Bond going over there to see after them, but don't remember seeing Burns go with her. Bond did not look after the business around home a great deal. He was in office a part of the time, and ever since I have known Mrs. Bond she did most of the looking after the farm stock. Bond was county judge when I first knew their place. I left there in 1914, after living there about six years. I never saw Burns going out with her to look after the cattle, nor did I see him riding around with her."

Hugh Barber, recalled:

"I remember of Burns moving some stock to a stalk field down there on the Bond place, and I was around there some. I don't remember that I ever stayed there all night, nor do I know, as a fact, that Burns stayed there all the time. I was around there quite frequently, and remember seeing Burns around there looking after his stock a few times. I don't know when he moved them away. I have seen the two defendants riding around quite frequently, but not just to-gether, but some of the girls would be along. I helped them carry their cattle out east there, but I don't remember just who was along, and some of Mrs. Bond's cattle were in the bunch, and I believe she was along herself."

Henry Webb:

"I live at Fleetwood, and have lived there some 15 years. I have known the defendant Ellison Burns for 17 years. He helped me with the cattle and worked around with them a year ago, and after he and his wife separated he moved to my house, moved his clothing and furniture. After he moved his cattle up there he stayed either in town or at Mrs. Bond's place, I don't know which. I don't remember the date when he got him a room there and stayed. I knew that his brother-in-law, Ramsey, had moved there, and knew when he had moved his cattle there, and his cattle stayed on the Bond place all the winter I supposed, and they were moved out of the pasture in the spring. I was down to the Bond place while he was staying there. I saw him and Mrs. Bond riding together a couple of years ago, but in the daytime. They came to my house at Fleetwood one time. They just stayed a few minutes. It was along in the middle of the evening. I don't know where they went from my place, nor do I know where they had been when they came. Mrs. Bond came down there with another lady with her, and Mr. Burns to get some pasture for some cattle. They were horseback, and I am not sure but what Mrs. Bond's daughter was along, too."

W. H. Musick:

"I live on Mrs. Bond's place, and have lived there since January, and live there now. I live in about a mile of her house. Curtis Ramsey and his wife were living there when I moved there. I think the defendant Burns had his cattle there in the stalk field at that time, too. Mrs. Bond was there when Ramsey moved there, and her brother came there shortly after, and stayed there. He came there in about a week after Ramsey moved there. Mrs. Bond stayed during that week at my house. After her brother came she stayed there a good while, and then went away, and her brother was there while she was gone. I have been acquainted with Mrs. Bond personally for about a year, and with Burns not quite so long. I don't remember exactly when Ramsey moved to her place, but I know where her girls were when

she was stopping at my house. Burns' cattle were on the place while I was there, and stayed there until about planting time. I had never been to any other pasture that they took these cattle to. Burns and I are on good terms. I know nothing about the conduct of these defendants. When they would come to see me they would be there about farming. As I said, Mrs. Bond stayed at my house every night for a week, and my place is about a mile from hers. The defendants would come to my house to see about working the land and other business, and would come when I was in the field at work plowing her land and working it. They were trying to make a division of land so as to accommodate all of Mrs. Bond's renters, and Burns was having nothing to do with it. I had bought some teams from him on a credit, and the teams were there on Mrs. Bond's place, and I am still there. When the two defendants would come to see me together, Mrs. Bond did the talking."

Mrs. Lula Bond:

"I live about 3½ miles from Terral, where I have been living for the last 16 years. I have been engaged in the business of farming and stockraising, and I have always looked after this business during the 16 years we have lived there. I know witness Towel. He lived on our place. I used to have Mr. Hopejoy and Mr. Towel and Mr. Burns there, and we saved a good many hogs to breed, and have had to have somebody to help alter them, and I always had somebody to help me mark and brand the cattle, and to attend to them in the pasture. At first when we didn't have so many cattle we kept them on the pasture at our home place, and after that I had to rent pasture and rented from anybody I could get one from. I used to rent from Mr. Clark down in the bottoms, and then I rented from Mr. Burns, and from Mr. Trout, and from just anybody I could. When the cattle were down on these pastures they were 3 or 4 miles away from home, and sometimes 15 or 16 miles away; and I would get anybody to help me look after them I could. I would go to see them myself, and would get anybody to go with me that I could get. I got Mr. Burns to go

with me, and I got Mr. Towel and Mr. Hopejoy, and Hugh Barber, and Earl Barber, and any of the cow hands, and I would get my girls to help me when they were at home, but they were gone to boarding school a part of the time, and when they were at home they always helped me. I have checks showing I paid Mr. Burns for helping me among my hogs as far back as 1908. He would brand the cattle, and dehorn them, and fix the fence and make the chute and load the hogs, and ship them out. I went with him the other side of Fleetwood, for I had cattle down there. Judge Bond most always rented the pasture for me, and a good deal of time Mr. Burns would assist me. I never went to the pasture but one time with nobody along but Mr. Burns, and Judge Bond knew everything we did. The first time he talked to me about it he wanted to sell and go to Oklahoma City; but after that when he didn't get elected to office, and I was unwilling to go because I did not see how we could make a living, and then it was our trouble began. The first time he brought up Burns to me was when I got to talking about getting a divorce, and then we talked about dividing the land, and we did divide it, and agreed on the division of the land. One of us took one girl to educate and the other took the other, and the one he left with me was 14 years old at the time. There was 160 acres of land deeded to me on the division and that was about 2 years ago. I didn't have anybody living with me after we separated except my daughter Marie, who was then 14 or 15 years old, and a negro man and his wife, and when the girl came from school she was taken away from me; then my brother came to live with me. Last fall I stayed in Texas a good deal, and rented my place to Ramsey, and I stayed over there with him until the weather got cold; then I came home to stay. My brother is living there yet. I rented him 60 acres of land and gave him part of the house to live in. I had sent for him to come from Colorado Springs, and he got there within 5 days after Ramsey had moved away. At the time I slept up at Mrs. Musick's. I was at home all day. There was never any improper relations between me and Mr. Burns. After Mr. Ramsey had moved to my place and the

weather got cold, I stayed over across the river in Texas with a renter, a man and his wife with two children. I kept two rooms at Mr. Ramsey's. Mr. Burns did not stay there until after he put his cattle in the pasture, and he was there quite often then. After my brother came there, I went away and stayed away until the 15th of January. My brother has gone now temporarily. I and Judge Bond lived down there about 16 years. I always managed everything about home, and he would do the financiering; he is not a farmer. Mr. Burns, Judge Bond, and I were all on good terms then, and the Judge would send him out to look after the stock while he himself would go to town. I and the Judge took a trip East to see the President inaugurated, and I came back in April, and he didn't come back until May in order to see our daughter graduate. I wrote him letters back there telling him to stay there, insisting on him staying, but I don't know that Mr. Burns helped me during his absence, nor do I have any recollection of my husband coming to me and telling me of the neighborhood talk of me and Mr. Burns riding around together; I have no recollection of that, and if it had happened I would have remembered. He did protest about me riding around with Ellison Burns after he wanted to divide the land. After he had protested I rode around with Burns only when I had business. I got other people to help me also. If some one else could have got the work done besides Mr. Burns, or, if I could have done so, I didn't do it. After the Judge had spoken to me about Burns, and wanted to divide the land, he himself employed Burns to look after the stock. I don't know that Judge Bond quit me altogether on account of Burns. It is true that we had a trial over the possession and custody over our daughter Sweet, and we tried it before the county court; then the case was appealed to the district court. And it is true that after he had protested to me about Burns that I rented him the stalk field, but I did it at the Judge's suggestion; after he had protested to me about riding around with Burns he told me to rent that stalk field to him. George Trout had been to see me about the field, and the Judge

said he had no objection to me renting it to Burns. I don't know that the relations between me and Burns was the talk of the neighborhood. I rented a part of my land to his brother-in-law, and I did it so as to have somebody there with me. I thought it was in my favor to have Burns' sister there, and his kinfolks, and I had my brother there. After Burns' brother-in-law moved there Burns came and had a place to sleep while there, and the room he slept in goes out in the yard, and joins the little room that I reserved for myself. I was not there the time the boy came hunting the mule. I was not there when one of Burns' friends came and brushed Burns' coat for him, nor did I ever go to Burns when he was drunk, nor was I ever in the pasture with him when we were alone, but one time, and that was 5 or 6 years ago, or several years ago when we first rented the pasture. Witness Cochran never saw me off of my horse at any place in his life. I was not with Mr. Burns the day Edwards says he saw us. Mr. Burns had two daughters of his own, and he rode around with a good many women. I myself have been all over the country with him, at every place where I had any cattle or stock, but there was always somebody else with us. I was not with him at Nocona, Tex. I was with him in the restaurant testified about by witness McKinley. If I ever had any occasion to go across the river into Texas with Ellison Burns, I did so. I didn't know the county attorney nor the deputy sheriff in Montague county, and they never saw me with Ellison Burns. I didn't know that I had been indicted in this case until my brother wrote me about it, and Mr. and Mrs. Ramsey had told me there was nothing to it. I don't know whether I left when the grand jury were in session or not. I never was arrested. Judge Womack sent me a blank, and I sent it to my brother and got it filled out, and came here with it to the clerk. Mr. Womack was the attorney that represented me. Mr. Bond deeded me 480 acres of land and kept 540 himself. The time they say I was at Nocona, Tex., was 2 or 3 years ago, and what I said before was that I didn't remember the incident. After that I recalled it. I did write to Judge

Bond while he was in Maryland. He had insisted on going for so long, and we could not afford for him to make the trip; we made the sacrifice for him to make the trip, and he wanted to stay one year, and he hadn't seen his relatives for 25 years, and after he had gone there he decided he wanted to come back and see Huse graduate, and I thought it would be better for him to stay; it had cost him so much to go, and I wrote and told him that. I wanted him to stay there and enjoy his visit and enjoy himself. George Trout came with Judge Bond to me about renting the land to Ellison Burns last fall. When Ramsey first moved to the place, I boarded with him awhile. After Burns came I had a gasoline stove and a kitchenette, and I cooked for myself, and I had so many canned things and meats that I thought I ought to eat them. Burns and I certainly did not live together."

C. M. Bond, recalled, for the state:

"After wife and I had separated, and prior to the time she rented this land to Burns, I knew only what she herself told me. I never was there with George Trout. She told me about her pasture when I went out there, and said a man had offered her $100 rent for it. I asked if she was going to let Burns have it, and she said 'No.' After Burns' cattle had been in there I talked to her about it again, and she said she couldn't help it that she never got a cent for the use of that pasture from Burns, and that she had already refused $100 rent for it from Mr. Majors. After our trouble I never employed Burns to look after my interest there. I never spoke to him, and he and she both know it."

The evidence in effect shows that the defendants were seen riding together on numerous occasions, both before and after the Bonds separated; that they made frequent visits to the stock pastures of Mrs. Bond in the daytime, sometimes by themselves and sometimes accompanied by others; that on one or two occasions they were seen riding

horseback together after night, going in the direction of Mrs. Bond's home; that after Mrs. Bond and her husband separated, and after Mr. and Mrs. Ramsey had moved into a part of Mrs. Bond's house, the defendant Burns also moved there and roomed and boarded with the Ramseys, while renting and using a stalk field on that place; that the rooms occupied by the two defendants, while not immediately connected by inside doors, could be entered one from the other by means of outside doors to each. There is an entire absence of evidence from any one of ever seeing these defendants in a compromising position, or of ever hearing the use of any endearing expressions by one toward the other. The evidence is also uncontradicted that while the defendants were living in the house with the Ramseys no lewd or lascivious conduct on the part of either of them was noticed by any one. Mrs. Bond specifically denies that any adulterous relation ever existed between Burns and her. There is no evidence whatever that these parties openly cohabited together as though the conjugal relation existed between them. At most, there is only a collection of circumstances shown from which the jury could have legitimately inferred that the defendants on several occasions had clandestinely engaged in acts of sexual intercourse. Had the state relied upon a specific act of adultery, and had there been a conviction of adultery alone, and not "living in open and notorious adultery," the conviction could have been sustained, but that is not this case.

The prosecution, from its inception to the rendition of the judgment, was for "living in open and notorious adultery." This court is bound by the record before us, and, applying the law to the facts of this case, the conclusion is reached that the evidence wholly fails to support a conviction of "living together in open and notorious adultery"

within the meaning of our statute, as construed in the cases above cited.

For the reason that the judgments are not supported by evidence sufficient to establish the material ingredients of the crime of "living together in open and notorious adultery," the same are reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

DOYLE, P. J., and ARMSTRONG, J., concur.