UNITED STATES, Appellee

v

DANNY W. CADENHEAD, Airman Second Class,
U. S. Air Force, and LEE E. WILCOX, Airman
Second Class, U. S. Air Force, Appellants

14 USCMA 271, 34 CMR 51

No. 16,823

December 6, 1963

*Major Hugh J. Dolan* argued the cause for Appellants, Accused. With him on the brief were *Colonel Daniel E. Henderson, Jr.,* and *Lieutenant Colonel Quincey W. Tucker, Jr.*

*Captain Donald W. Brewer* argued the cause for Appellee, United States. With him on the brief was *Colonel Emanuel Lewis.*

## Opinion of the Court

QUINN, Chief Judge:

On their pleas of guilty, the accused were convicted of robbery of $4.72, from a Japanese taxi driver, in violation of Article 122, Uniform Code of Military Justice, 10 USC § 922. Each was sentenced to a bad-conduct discharge, confinement at hard labor for six months, partial forfeiture of pay, and reduction in rank. The convictions were approved by the convening authority and, with some modification of the forfeitures, were affirmed by the board of review. At trial, and on review, the accused contended that under the agreement with Japan, covering the status of American forces in that country, trial by court-martial was barred by previous proceedings against them instituted by the Japanese authorities.

The offense was committed during the early morning of August 4, 1962, in the City of Fukuoka. Almost immediately after its commission, the accused were apprehended by the Japanese police. At the time they were nineteen years of age. Pending investigation by the Japanese Prosecutor's Office, the accused made restitution, and otherwise indicated "how sorry and repentant" they were. On August 22, 1962, United States authorities were informed by the Japanese Ministry of Justice that the Japanese intended to exercise jurisdiction over the accused "by bringing an indictment" and proceeding with "Formal Trial." Under the Japanese Juvenile Law, persons under twenty years of age who are "alleged to have committed an offense" are, along with certain other minors, subject to the jurisdiction of the Family Court. This court "operates in a manner similar to Juvenile Courts in the United States." Instead of proceeding in the regular Japanese criminal courts, the Public Prosecutor's Office turned over the accused's cases to the Family Court for disposition. A judge of the Family Court "held hearings" which, under the Japanese Juvenile Law, were not open to the public and at which the accused were not represented by counsel. Since the accused were "foreigners" he considered it impossible to apply the "educative" policy of the Japanese Juvenile Law, and, therefore, entered a decision which resulted in the accused's release. Thereafter, the present charge was brought against each accused, and was referred to a common trial by court-martial.

American military personnel stationed in Japan on a permanent basis

may be tried by Japan for offenses committed within its terri- tory and punishable by its law. Wilson v Girard, 354 US 524, 1 L ed 2d 1544, 77 S Ct 1409 (1957). The exercise of criminal jurisdiction is conditioned by Treaty and Executive Agreement (hereafter referred to as Status of Forces Agreement) with the United States. 11 United States Treaties and Other International Agreements 1652, 1664, superseding the 1953 Security Treaty and Administrative Agreement, 4 UST 1847. Recognizing that an offense under Japanese law may also constitute a violation of the Uniform Code of Military Justice, the Agreement provides a limited rule against double jeopardy for the same offense, while the accused remains in Japanese territory. It is this provision that is said by the accused to bar trial on the instant charge. The provision reads as follows:

"Where an accused has been tried in accordance with the provisions of this Article either by the military authorities of the United States or the authorities of Japan and has been acquitted, or has been convicted and is serving, or has served, his sentence or has been pardoned, he may not be tried again for the same offense within the territory of Japan by the authorities of the other State. However, nothing in this paragraph shall prevent the military authorities of the United States from trying a member of its armed forces for any violation of rules of discipline arising from an act or omission which constituted an offense for which he was tried by the authorities of Japan."[1] [Article XVII, paragraph 8, Status of Forces Agreement, 11 UST 1665–1666.]

The double jeopardy provision was added to the original North Atlantic Treaty Organization, Status of Forces Agreement, 4 UST 1792, which is the prototype of the Agreement with Japan, at the request of the American representative.[2] So far as we have been able to ascertain, no administrative or judicial authority has attempted to define the various proceedings within the scope of paragraph 8. Apparently, there is some difference of opinion on whether to accord the provision a narrow construction, or to give it such meaning as would encompass "every kind of proceeding which contemplates punishment for wrongful conduct." United States v Sinigar, 6 USCMA 330, 340, 20 CMR 46, opinion by Chief Judge Quinn; see also Snee and Pye, Status of Forces Agreements and Criminal Jurisdiction, page 68 (1957). However, it is clear that whether strictly or loosely construed not every proceeding by a receiving state against a member of the American armed forces stationed within its borders is a "trial" within the meaning of the Status of Forces Agreement. United States v Sinigar supra. In our opinion, the Japanese Family Court proceeding was not a "trial" within the meaning of paragraph 8.

Judge Tonari Takiguchi, who presided at the Family Court proceeding, testified that such proceedings are substantially similar to proceedings in juvenile courts in the United States. Those provisions of the Japanese Juvenile Law which are set out in the record of trial indicate that the Family Court has jurisdiction over persons under twenty years of age who are "alleged to have committed an offense" and those who are "prone to commit an offense" because of certain enumerated circumstances in their backgrounds. In material part, the "aim" of the proceedings is to achieve the "wholesome rearing of juveniles, to carry out educative measures relating to the character correction and environmental adjustment of delinquent juveniles." According to Judge Takiguchi, the Family's Court's purpose "is educative, not

[1] It is unnecessary to consider the meaning and effect of that part of paragraph 8, Article XVII, Status of Forces Agreement, 11 UST 1665–1666, which authorizes disciplinary proceedings by the sending state, notwithstanding prior trial on the same offense by the receiving state. See Snee and Pye, Status of Forces Agreements and Criminal Jurisdiction, pages 80–88 (1957).

[2] See Snee and Pye, op. cit., page 80.

punitive." The Japanese Juvenile Law defines "educative measures" as probationary supervision by the Probation-Parole Supervision Office, a commitment to a Child Education and Training Home or a Home for Dependent Children, or commitment to a Reform and Training School. Hearings in a case are not open to the public, and under Article 22 are required to be "conducted in a mild atmosphere with warm consideration" toward the juvenile. Similar testimony as to the purpose and conduct of the proceeding was given by Professor Masaji Inoue, Senior Professor of Criminal Law at Kyushu University.

In their able and helpful brief, appellate defense counsel contend that a juvenile delinquent proceeding is an "adjunct to the general system of criminal justice." Briggs v United States, 226 F2d 350, 351 (CA DC Cir) (1955); see also United States v Dickerson, 168 F Supp 899 (DC DC) (1958), reversed on other grounds, 271 F2d 487 (CA DC Cir) (1959). Consequently, they argue, all the safeguards of a defendant in the criminal law, including protection against double jeopardy, are applicable to juvenile delinquent proceedings. See United States v Dickerson, supra; contra, People v Silverstein, 121 Cal App 2d 140, 262 P2d 656 (1953). The argument is appealing, although we are not at all sure that the conclusions advanced by counsel, as they relate to Japanese Family Court proceedings, are correct. For example, Judge Takiguchi and Professor Inoue disagreed on the applicability of the Japanese constitutional provision against double jeopardy to Family Court proceedings. Judge Takiguchi was of the opinion that while the language of the constitutional provision did not specifically extend to juvenile proceedings, "the spirit of the Japanese Juvenile Law" brought it within the scope of the protection against double jeopardy. He cited a ruling by the District Court of Asahigawa in support of his opinion. Conversely, Professor Inoue testified "there is no jeopardy." He noted that the Asahigawa District Court ruling had

been criticized in several legal journals, and that in his opinion it was "incorrect." He further testified that "the recorded opinions of scholars are of equal weight" with the decisions "of minor courts such as the Asahigawa District Court" and the Asahigawa case did not "represent of law of Japan." Our construction of Article XVII makes it unnecessary to explore the ramifications of the defense argument, or to consider specifically whether double jeopardy, as a constitutional principle, applies to juvenile delinquent proceedings in either Japan or the United States.

As we read Article XVII, it contemplates a proceeding directly intended to vindicate the penal law. ██ We agree with appellate defense counsel that in construing the Article we ought not to be chained to fixed conclusions by the tyranny of labels. Also, we are in sympathy with the idea that "precious constitutional rights cannot be diminished or whittled away by the device of changing names of tribunals or modifying the nomenclature of legal proceedings." United States v Dickerson, supra, page 902. We cannot, however, disregard the plain language of the Article and add to it something which is not there. United States v Dickenson, 6 USCMA 438, 20 CMR 154.

In the absence of paragraph 8, these accused would have been subject to prosecution by both the United States and Japan. See Wilson v Girard, supra. However, the paragraph imposes a restriction on the exercise of such concurrent power. The inescapable burden of the restriction is that there be a proceeding under the regular penal laws, which, if resulting in conviction, would subject the accused to the penalties authorized by the penal statutes. Paragraph 8 uses such words as "tried . . . and . . . acquitted," "convicted and . . . serving . . . his sentence," and "pardoned." Other parts of Article XVII speak of "offenses . . . punishable" by law; or "arrest"; of the "seizure . . . of objects connected with an offense"; of the "death sentence" and "a sentence of imprisonment." All these words and phrases

are commonly and intimately associated with proceedings under the regular penal law of the state. See Ammidon v Smith, 1 Wheat 447 (U. S. 1816); Petition of De Angelis, 139 F Supp 779, 780 (ED NY) (1956). The Agreed Views of the Joint Committee appointed to implement the original agreement point in the same direction. Agreed View No. 40 provides that when Japan has the right to exercise primary jurisdiction but does not notify the United States within the period of time specified for the particular offense that "it will exercise jurisdiction *by bringing an indictment in the case*," or if "notice is received that Japan *will not bring an indictment*, the United States may exercise jurisdiction." (Emphasis supplied.) Far East Command Pamphlet No. 27–1, January 1956.

We realize, of course, that in Japan the formal charge is not by indictment of the Grand Jury, as in the United States, but by action instituted by the public prosecutor. Article 247, Japanese Penal Code. Also, it appears that either the description of the prosecutor's action has been changed, or the Joint Committee translation of the Japanese law differs from that adopted by the Japanese Ministry of Justice in that the latter describes the formal charge as "an information." Article 256, Japanese Code of Criminal Procedure, as translated in the English edition of The Constitution of Japan and Criminal Statutes, edited by the Japanese Ministry of Justice, 1958. For our purposes, the significant fact is that the Agreed Views use the terminology for the regular criminal proceeding, which is different from the terminology for the juvenile proceeding. The latter describes the formal paper by which the prosecutor, or other public official, refers the case of a juvenile to the Family Court as "a document." Article 8, Japanese Rules of Juvenile Proceedings. There are substantial differences in content between these papers, including the fact that no "evidential document or other things, which may cause the judge to frame a prejudication," can be annexed to an information, whereas in a juvenile case, all available data must "be annexed to the sending document."

We have already pointed out that the proceedings in the Family Court of Japan are "educative" not "criminal." The "key idea," according to the testimony of Professor Inoue, "is guardianship." In this regard, the purpose is comparable to juvenile delinquency proceedings in the District of Columbia and in most American states. See United States v Roark, 8 USCMA 279, 24 CMR 89; Borders v United States, 256 F2d 458 (CA 5th Cir) (1958); Thomas v United States, 121 F 2d 905, 907 (CA DC Cir) (1941). As far as the record indicates, no indictment or information appears to have been returned as to either accused. Judge Takiguchi testified he received "the investigation of the Family Court" and conducted hearings thereon. It is indeed true that the Family Court could have imposed some sort of restraint upon the accused, but that possibility does not change the proceeding into a criminal prosecution. We have already held that a contempt proceeding which results in confinement is not a "trial" within the meaning of Article XVII. United States v Sinigar, supra. Other proceedings, such as one to adjudge a person mentally incompetent, also may result in restraint of the respondent, but are not criminal in purpose or effect. The juvenile proceeding as established in Japan and in many of the American states is fundamentally civil, not criminal, in nature. Its objective is not punishment within the limits prescribed by the penal code, but the care and guidance of the juvenile. See In re Kroll, 43 A2d 706 (Mun Ct App DC) (1945); Shioutakon v District of Columbia, 236 F2d 666 (CA DC Cir) (1956); United States v Roark, supra. Since the personal disability imposed by the decree in a juvenile proceeding is not the exaction of punishment under the penal law, it may be doubted that relief from such disability could be accorded by pardon by the Chief Executive. Ex parte Campion, 79 Neb 364, 112 NW 585 (1907); In re Nevitt, 117 Fed 448, 460 (CA8th Cir) (1902); In re Attorney, 86 NY 563. In our opin-

**275**

ion, the proceeding against these accused in the Japanese Family Court did not constitute prosecution for a criminal offense under the laws of Japan, and was not a "trial," under Article XVII. Accordingly, the law officer correctly denied the motion to dismiss.

At trial, the accused predicated their application for relief from trial by court-martial on the ground they had been "previously tried, convicted, and sentenced" by the Japanese authorities. On this appeal, appellate defense counsel have enlarged the argument to include a contention that if the Family Court proceeding is not a trial within the meaning of Article XVII, trial by court-martial is nonetheless barred because the Japanese government had the primary right to exercise criminal jurisdiction and that right was not waived. The Government advances two arguments in opposition. First, it contends that since the point was not relied upon at trial, it cannot be raised on appeal for the first time. Secondly, it maintains that, even if the United States exercised court-martial jurisdiction in disregard of the primary right of Japan, the accused have no standing to object because a violation of the agreement merely raises a diplomatic issue between the United States and Japan. See Ponzi v Fessenden, 258 US 254, 66 L ed 607, 42 S Ct 309 (1922) ; United States v Farrell, 87 F2d 957, 962 (CA 8th Cir) (1937); cf. Edye v Robertson, 112 US 580, 28 L ed 798, 5 S Ct 247 (1884).

We need not reach either aspect of the Government's opposition. Manifestly, the Japanese authorities were not deprived of, or precluded from, the right to exercise criminal jurisdiction. The accused were released to the custody of the Japanese authorities, and those authorities instituted such proceedings against the accused as they thought appropriate under Japanese law. Judge Takiguchi of the Family Court testified that his disposition of the accused's case was "a final Decision in . . . [his] Court." Thereafter the accused were released by the Japanese authorities and returned to military control. The Japanese, therefore, exercised jurisdiction over the accused to the full extent they believed desirable under Japanese law and practice.

Whether the action taken by the Japanese authorities amounted to a determination not to prosecute criminally and therefore "constitute[d] an exercise of jurisdiction in the sense of" Article XVII, paragraph 3 of the Agreement[3] (see Snee and Pye, *op. cit.*, page 72), or whether it was an affirmative waiver of the primary right to exercise criminal jurisdiction (see Note re Aitchison v Whitley, Cour de Cassation (France), 52 American Journal of International Law 789 (1958)), so far as Japan was concerned, it evidenced a determination to end Japanese interest in, and control over, the accused. The record of trial does not show that the determination to release the accused without criminal prosecution was communicated to the United States authorities in the form or according to the procedure adopted by the Joint Committee. See Far East Command Pamphlet No. 27–1, supra. Passing over the question of whether the accused had the burden of proving failure to comply with established procedure, substance not form controls. See United States v Walker, 1 USCMA 580, 5 CMR 8; United States v Richardson, 1 USCMA 558, 567, 4 CMR 150. In our opinion, the Japanese disposition of the case was final and left the United States free to exercise its own criminal jurisdiction over the accused.

The decision of the board of review is affirmed.

Judges FERGUSON and KILDAY concur.

---

[3] Paragraph 3(c), Article XVII, Status of Forces Agreement, 11 UST 1664–1665, reads in pertinent part as follows: "If the State having the primary right decides not to exercise jurisdiction, it shall notify the authorities of the other State as soon as practicable."