UNITED STATES, Appellee

v

DARIEL F. CARTER, Staff Sergeant, U. S. Army, Appellant

16 USCMA 277, 36 CMR 433

No. 19,228

July 8, 1966

*Captain Melvin K. Najarian* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph L. Chalk, Lieutenant Colonel Martin S. Drucker,* and *Lieutenant Colonel Jacob Hagopian.*

*Captain Stephen G. Weiss* argued the cause for Appellee, United States. With him on the brief were *Colonel Joseph J. Crimmins* and *Lieutenant Colonel Francis M. Cooper.*

## Opinion of the Court

KILDAY, Judge:

Tried by general court-martial in Verdun, France, this accused was convicted, contrary to his plea of not guilty, of larceny, obstructing justice, and adultery, violations of Articles 121 and 134, Uniform Code of Military Justice, 10 USC §§ 921 and 934, respectively. The sentence imposed consisted of a bad-conduct discharge, total forfeitures, reduction to the enlisted grade of E–1, and confinement at hard labor for two years.

Thereafter, the convening authority approved the findings and so much of the sentence as provided for a bad-conduct discharge (suspended for a time definite, with provision for auto-

matic remission), confinement at hard labor for one year, and total forfeitures.

The board of review affirmed the findings and approved only so much of the sentence as provided for a bad-conduct discharge, as suspended by the convening authority, forfeiture of $50.00 per month for twelve months, and confinement at hard labor for one year.

Having exercised his right of petition pursuant to Article 67(b)(3), Uniform Code of Military Justice, 10 USC § 867, this Court granted Sergeant Carter's appeal in order to give consideration to two issues. Inverse to the order granted, they are:

"THE LAW OFFICER ERRED IN ADMITTING PROSECUTION EXHIBIT 5 INTO EVIDENCE WHERE THE DEFENSE COUNSEL OBJECTED TO ITS ADMISSION ON THE GROUNDS OF AN ILLEGAL SEARCH."

"THE LAW OFFICER ERRED IN FAILING TO GRANT THE DEFENSE MOTION TO MAKE THE ADULTERY CHARGE MORE SPECIFIC OR TO DISMISS THE ADULTERY CHARGE."

The evidence of record reveals that a Lieutenant Franson and his wife arrived at the U. S. Army General Depot Complex, Verdun, France, during the month of July 1964. He was appointed Dependent Schools Officer having supervisory responsibility for schools in Brienne, Vitry le Francois, and Vassincourt. These duties he assumed in August 1964.

At this time, and for the year preceding, the accused had served at the Verdun Dependent School as supply sergeant. Thus, during the first two weeks in August Lieutenant Franson, with the assistance of Sergeant Carter, conducted an inventory of the supply rooms of the Verdun School as well as the Etain Elementary School. One of two tape recorders in being and on the supply records of the former school was a Grundig tape recorder, serial number 502140820 having been issued to the school in April 1964.

This instrument, offered into evidence as Prosecution Exhibit 5, was subsequently removed from Sergeant Carter's home by United States authorities for it had been property taken by the sergeant without his superior's knowledge or permission.

To achieve this end, the accused in some fashion—one version involves an exchange for coffee—obtained an identical Grundig tape recorder bearing the serial number 502140828. Subsequently, an assistant of the accused, at the latter's direction, filled out a turn-in slip covering an unserviceable recorder, serial number 502140820.

Accused next appeared at the Dependent Educational Group Warehouse in Karlsruhe, Germany, where he turned in, accompanied by the above-mentioned turn-in sheet, a Grundig tape recorder.

Although deposited in the "unserviceable" room at the warehouse on October 9, 1964, a physical inventory made thereafter revealed it missing. In its stead was discovered the recorder, serial number 502140828.

In time, Sergeant Carter told Mrs. Franson he had "swiped" a recorder from the Dependent Educational Group Warehouse. She in turn relayed this information to her husband which he reported to the authorities. Thus began the investigation resulting in the repossession of the missing instrument.

When it was offered into evidence by the prosecution, defense objected on the ground that it was the product of an unlawful search and seizure.

Facts which stand uncontradicted reflect that this accused resided off the military reservation in what is described as rental guarantee housing. In short, it is housing created and owned by a private French corporation under guarantee arrangements for full occupancy by the United States Government with lodging assignments being held by American authorities. The corporation is obligated—so long as full occupancy is guaranteed—to rent only to the American military or civilian employees as well as their dependents.

Because all parties have seemingly long agreed that such housing came under French jurisdiction, responsible American military officers—in keeping

**279**

with the provisions of the NATO Status of Forces Agreement—had, on a past occasion, discussed with their French counterpart the need of French assistance relative to searches made by the American military of such off-post dwellings. A meeting between the post provost marshal, a judge advocate general representative, and a commissioner of the Verdun Police ended with the Americans being informed that they could conduct such searches as the one at hand without making prior arrangements with French authorities. It was further agreed that this meeting was to be considered as satisfying the liaison requirements set forth under the Status of Forces Agreement. Certain exceptions, saved by the French, regarding their exercise of sovereignty are unrelated to this case and need not be mentioned.

Nevertheless, after United States agents received authority from the post commander to search this petitioner's abode, a liaison was made by telephone with Verdun City Police who were informed of both the need and reasons for the pending search. Again the Chief of the Verdun Police authorized the Criminal Investigations Detachment to proceed alone in view of the fact that only American military persons and property were involved.

Then, as now, counsel for Sergeant Carter assert that the Status of Forces Agreement, Article II and Article VII, §§ 6(a) and 10(a), (b),[1] clearly reflect that the French have complete control over its own territory; that the American military have no right to act on French soil except as provided under the terms of the Agreement; that in areas not covered by the Agreement, the laws of France control; and that, because proper procedures were not followed to secure French permission and assistance, the search was in derogation of French law, of the Agreement, and therefore illegal.

Support for this position is also purportedly found in paragraph 6g, USACOMZEUR Circular 633–65,[2] February 4, 1960.

It is further insisted that paragraph

---

[1] "It is the duty of a force and its civilian component and the members thereof as well as their dependents to respect the law of the receiving State, and to abstain from any activity inconsistent with the spirit of the present Agreement, and, in particular, from any political activity in the receiving State. It is also the duty of the sending State to take necessary measures to that end." [4 UST 1792, 1796, TIAS 2486, June 19, 1951.]

"6. — (a) The authorities of the receiving and sending States shall assist each other in the carrying out of all necessary investigations into offences, and in the collection and production of evidence, including the seizure and, in proper cases, the handing over of objects connected with an offence. The handing over of such objects may, however, be made subject to their return within the time specified by the authority delivering them." [Id. at 1800.]

"10. — (a) Regularly constituted military units or formations of a force shall have the right to police any camps, establishments or other premises which they occupy as the result of an agreement with the receiving State. The military police of the force may take all appropriate measures to ensure the maintenance of order and security on such premises.

"(b) Outside these premises, such military police shall be employed only subject to arrangements with the authorities of the receiving State and in liaison with those authorities, and in so far as such employment is necessary to maintain discipline and order among the members of the force." [Id. at 1802.]

[2] "Except as noted in paragraph 6h, installation commanders in France do not have the authority to order searches of individuals, their clothing, property, or living quarters outside the confines of the installation. Should searches of this nature become necessary, the commander concerned will present the pertinent facts of the case to the appropriate French authorities for action. Military personnel will not participate with French authorities in searches outside the confines of a military installation. They may, however, with the permission and invitation of the French authorities, accompany the searching party merely as observers. Any evidence seized by the French searching party may be turned over to the US

152, Manual for Courts-Martial, United States, 1951,[3] is in conflict with the above-mentioned provision and must be overridden by the Agreement insofar as the former permits an American military commander to authorize—without more—a search of off-post, civilian-owned property occupied by the Americans.

Conversely, counsel for the Government believe that all Status of Forces Agreement obligations were met; that the, Agreement and paragraph 152, Manual for Courts-Martial, United States, 1951, are not incompatible; but that the purported violation of the NATO Status of Forces Agreement is totally irrelevant to the rights of an accused at a trial by court-martial.

It is with the Government's position that we must agree, for the Court is unanimous in its belief that the only pertinent question present, under the facts of this case, is whether or not the authority to search was granted upon probable cause. In essence, this is the very direction taken by both the majority and dissenting opinions in United States v DeLeo, 5 USCMA 148, 17 CMR 148.

The Status of Forces Agreement confers no *individual* right and most assuredly seeks only to preserve those protections presently existing. The report of the Secretary of State, transmitted by President Truman for the information of the Senate on June 16, 1952, states:

"The purpose of the agreement is to define the juridical status of the forces of one North Atlantic Treaty country when stationed in the territory of another treaty country. The development of collective defense in peacetime requires that forces of various countries which form part of the integrated force for the defense of the North Atlantic Treaty area be stationed in the territory of another treaty country. They must also be free to move from one country to another in accordance with the demands of strategy. Therefore, it is essential that there be uniformity of arrangements and procedures governing the status of such forces in countries other than their own and their relationship to the civilian authorities. The agreement undertakes, accordingly, to regulate this relationship by guaranteeing the armed forces adequate legal protection and at the same time, without infringing on the authority of the military command, fully recognizing the peacetime rights and responsibilities of the civilian authorities in the host countries."

In a report from the Committee on Foreign Relations on the Agreement, authored in 1953 during the First Session of the 83d Congress, the purpose of the Agreement was said to be in part:

"The jurisdiction which foreign courts will have over Americans under this agreement is limited, as pointed out above, to offenses committed off duty and not against another American in the armed forces or civilian component. American jurisdiction is retained for offenses against the property or security of the United States and against the person or property of another member or dependent of the United States force, or civilian component.

"Further, the American on trial in a foreign court will have all the

military authorities formally, as prescribed in paragraph 6(a), Article VII, NATO Status of Forces Agreement."

[3] "A search of property which is owned or controlled by the United States and is under the control of an armed force, or of property which is located within a military installation or in a foreign country or in occupied territory and is owned, used, or occupied by persons subject to military law or to the law of war, which search has been authorized by a commanding officer (including an officer in charge) having jurisdiction over the place where the property is situated or, if the property is in a foreign country or in occupied territory, over personnel subject to military law or to the law of war in the place where the property is situated."

rights to which a citizen of the country in question is entitled, and he must specifically be accorded such rights as those to a prompt and speedy trial, to be confronted with the charges and witnesses against him, to subpena witnesses in his own behalf, to be represented by counsel, to have an interpreter, and to communicate with his Government." [Executive Report No. 1, April 28, 1953.]

It should be further noted that within the terms of the Agreement specific rights are set forth and thus preserved: namely, speedy trial, being informed in advance of trial as to the charges made against him, confrontation of witnesses, compulsory process for obtaining witnesses in his favor if within the jurisdiction of the receiving state, to have legal representation, to have services of a competent interpreter if necessary, and being able to communicate with representatives of the Government of the sending state including, when rules of court permit, their presence at trial.

Hearings before the Senate Committee on Foreign Relations during the 83d Congress, First Session, clearly reflect concern over the preservation of existing rights. For example, the witnesses appearing before that Committee were queried regarding the presumption of innocence, trial by jury, provisions for bail, and proof beyond a reasonable doubt as distinguished from proof by a preponderance of the evidence.

Lastly, the United States Senate, in giving its advice and consent to the ratification of the NATO Status of Forces Agreement included a statement of "the sense of the Senate" wherein it was asserted that where a person subject to military jurisdiction was to be tried by the authorities of a receiving state under this agreement, the commanding officer was to examine the laws of that state with particular reference to the procedural safeguards contained in the Constitution of the United States and if need be request the authorities of the receiving state to waive jurisdiction. 99 Congressional Record 8835 (1953).

One may also, in this regard, examine our opinion in United States v Plante, 13 USCMA 266, 32 CMR 266. Plante was tried by a general court-martial convened in France for the larceny of Government equipment. During an investigation by French police of a black marketeer, accused was brought in, questioned, and ultimately made an incriminating statement that was heard by an American investigator then present. The accused had not been warned of his rights at this time and on this basis it was said the statement was inadmissible. We rejected this argument saying:

"It is clear that nothing in the foregoing 'sense of the Senate,' which deals with trials, not investigations, could possibly be construed as placing any obligation on the military to give the warning required by Article 31 under the circumstances of the case presently at bar." [United States v Plante, supra, at page 272.]

United States v Vierra, 14 USCMA 48, 33 CMR 260, is also apropos for it concerned the Ryukyu Civil Administration Court. We there rejected the argument that the court's warrant to search had to be additionally supported by the express authorization of military authorities.

Single use of the French criminal processes would have hardly worked to petitioner's benefit and we need say no more than to suggest a comparison between the requirements of an American warrant (United States v Hartsook, 15 USCMA 291, 35 CMR 263) with the embodiment of a French Commission Rogatorie as described in United States v DeLeo, 5 USCMA 148, 17 CMR 148. (Cf. United States v Scoles, 14 USCMA 14, 33 CMR 226.) Had such been a requirement, no doubt constitutional questions would have arisen. (Boudinot v United States, 11 Wall 616 (U. S. 1871).)

Passing to the Agreement proper, we observe that, as to the facts of this case, there existed concurrent but primary jurisdiction in the United States under Article VII, section 3(a) (i).[4]

---

[4] "3. In cases where the right to ex-

Circumstances required that they call upon the French for assistance under Article VII, section 6(a), and this they did. In turn, there is no reason to doubt the effective waiver by French authorities as regard their right to institute and to partake in the search that followed. Waiver of primary jurisdiction is provided for under Article VII, section 3(c).[5] Treaties should be interpreted in a spirit of *uberrima fides*—construed to uphold the public faith. (Sullivan v Kidd, 254 US 433, 65 L ed 344, 41 S Ct 158 (1921).)

The defendant's approach to this matter, if followed to its logical end, could become a haven for a transgressor in that American authorities would be bound by sins of omission of their counterpart upon which the Americans had relied in good faith. To such a result we cannot subscribe, for a treaty —like any other statute—must be construed reasonably and so as to accomplish its obvious purpose. Ross v Pan American Airways, 299 NY 88, 85 NE 2d 880, 13 ALR2d 319 (1949). Applying the rule of *pari materia,* its terms must be construed together and not out of context. (Hamilton v Erie R. Co., 219 NY 343, 114 NE 399 (1916); Sullivan v Kidd, supra.)

In United States v Cadenhead, 14 USCMA 271, 34 CMR 51, it was argued by the Government, just as it is here, that this is a question of diplomatic nature and must be resolved by the sovereign states. Ponzi v Fessenden, 258 US 254, 66 L ed 607, 42 S Ct 309 (1922); cf. Wilson v Girard, 354 US 524, 1 L ed 2d 1544, 77 S Ct 1409 (1957); United States v Plante,

supra, at page 272. In Edye v Robertson, 112 US 580, 598, 28 L ed 798, 5 S Ct 247 (1884), it was said:

"A treaty is primarily a compact between independent Nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war. It is obvious that with all this, the judicial courts have nothing to do and can give no redress."

In *Cadenhead,* supra, we considered the matter of waiver, but in different form, for that case concerned our relations with Japan under a Status of Forces Agreement. We were there concerned with whether or not there had been an affirmative waiver of the primary right to exercise jurisdiction. Recognizing the potency of these arguments, we nonetheless resolved the question there—and do so here—on the ground that the evidence before us clearly reflects a waiver by the French to proceed as they might under the Status of Forces Agreement. We thus rely upon substance rather than form. It can never be presumed that a state intended to provide a means of perpetrating a fraud. (United States v The Amistad, 15 Peters 518 (U.S. 1841).)

The end result is that, under the facts of this case, there is complete consistency between the terms of the Status of Forces Agreement and the

---

ercise jurisdiction is concurrent the following rules shall apply:

    (a) The military authorities of the sending State shall have the primary right to exercise jurisdiction over a member of a force or of a civilian component in relation to

      (i) offences solely against the property or security of that State, or offences solely against the person or property of another member of the force or civilian component of that State or of a dependent. . . ." [4 UST 1792, 1800.]

[5] "(c) If the State having the primary right decides not to exercise jurisdiction, it shall notify the authorities of the other State as soon as practicable. The authorities of the State having the primary right shall give sympathetic consideration to a request from the authorities of the other State for a waiver of its right in cases where that other State considers such waiver to be of particular importance." [4 UST 1792, 1800.]

pronouncements of paragraph 152, Manual for Courts-Martial, United States, 1951, for authority to authorize the search may be found under the terms of both. Accordingly, we return to the basic question of whether or not this authority was granted upon probable cause. In so doing we emphasize that no issue is made as to the worth of this search except on the ground just covered.

In United States v Hartsook, 15 USCMA 291, 294, 35 CMR 263, we observed:

". . . Power to authorize a search is within the province of the commanding officer, including an officer in charge. Paragraph 152, Manual for Courts-Martial, United States, 1951. In this context he stands in the same relation vis-a-vis the investigating officer and an accused as the Federal magistrate. And we have so equated him."

Then,

"While he issues no warrants, the commanding officer is bound by the same rules in authorizing a search as his opposite number; that is, probable cause to believe that the things to be seized are on or within the premises to be searched."

Paraphrasing United States v Ness, 13 USCMA 18, 32 CMR 18, this means that authority to search is valid if probable cause appears upon the facts presented to the officer granting the authority. Defined, probable cause is said to exist "if the facts and circumstances justify a prudent man in concluding that an offense has been or is being committed." Furthermore, "hearsay" may be the basis for such authority. United States v Ness, supra; United States v Penman, 16 USCMA 67, 36 CMR 223.

The facts of this case clearly demonstrate both the validity of the affidavit presented and the existence of probable cause upon which to authorize the search. The commanding officer was presented a formal request in writing for permission to search this petitioner's specifically identified dwelling.

Though the request mentions only stolen Government property, accompanying affidavits made by Lieutenant and Mrs. Franson clearly demonstrated that the property in question was the Grundig tape recorder and the commanding officer so acknowledged when testifying.

The adultery specification of which the accused was charged reads:

"In that Staff Sergeant E–6 Dariel F Carter, US Army, Headquarters Company, US Army General Depot Complex, Verdun, APO 122, US Forces, a married man, did at Vaux, Meuse, France, between 1 July 1964 and 20 October 1964, wrongfully have sexual intercourse with Mrs. . . . , a married woman not his wife."

At the inception of this trial the defense moved, unsuccessfully, to make the date of the alleged adultery certain and, if this could not be done, dismissal of the charge. His theory was that adultery could not properly be considered a continuing offense. As the specification then stood, he voiced the opinion that a proper defense could not be prepared. It was asserted that while he was able to find defense evidence relating to every known date that the prosecution could put forth against Sergeant Carter and Mrs. . . . , he could not defend the sergeant against the broad allegation covering the period July 1 and October 20, 1964. Their case being circumstantial, Government responded that they could offer nothing of a more certain nature.

In support of this motion reference was made to two specific cases. The case of United States v Frayer, 11 USCMA 600, 29 CMR 416—because it concerned adultery, though it was conceded that the precise issue at hand was not involved—and, the subsequent case of United States v Means, 12 USCMA 290, 30 CMR 290, for the dissenting opinion in that case specifically alluded to *Frayer*, supra, concluding that, indeed, adultery was not a continuing offense.

The evidence found in this record, suffice to say, demonstrates that petitioner occupied an apartment in Vaux,

France, during the period of time covered by the specification. During this time the petitioner and Mrs. . . . were seen together in the apartment, and about the building. Their automobiles were often parked there during the course of the day and night. They displayed open affection for each other.

On October 17, 1964, Lieutenant and Mrs. Franson visited the petitioner's apartment and found both him and his paramour in a state of undress, with a bed in disarray. At a time thereafter, accused conceded to Lieutenant Franson that he had in fact committed adultery.

As long ago as United States v Marker, 1 USCMA 393, 400, 3 CMR 127, this Court recognized that the ancient rigor of common-law pleading had been tempered. Under the more modern rule formal defects in indictments, not prejudicial, could be disregarded. We said:

"Fortunately we are no longer bound by the ancient rigor of pleading at common law. It is the modern rule that formal defects in indictments, not prejudicial, will be disregarded. 'The true test of the sufficiency of an indictment is not whether it could have been more definite and certain, but whether it contains the elements of the offenses intended to be charged.' Hagner v United States, 285 US 427, 431, 76 L ed 861, 865, 52 S Ct 417. If the indictment informs the accused of what he must be prepared to meet, and is sufficiently definite to eliminate the danger of future jeopardy, it will be held sufficient. Martin et al v United States, 299 F2d 287 (CA4th Cir); Roberts v United States, 137 F2d 412 (CA4th Cir); Nye v United States, 137 F2d 73 (CA4th Cir).

"Testing the specifications before us by the standards set out above, we find them to be sufficient. We find no problem of duplicity in Specification 2. The acts there set out constitute succeeding steps in a continuing transaction. The stated facts fully apprized petitioner of the nature of that transaction. Broken into separate specifications, each alleging a completely separate act, a problem of objectionable multiplicity might even have been encountered—although we express no final opinion on this subject."

In the later case of United States v Schumacher, 2 USCMA 134, 135, 7 CMR 10, we were concerned with a specification alleging the taking of indecent liberties with a young girl for the period "from on or about June 15, 1950, to on or about August 1, 1950." We again said:

". . . We have already made clear the test to be applied in determining the sufficiency of a specification—it must reasonably inform the accused of the charges he is expected to meet, enable him to properly prepare his defense, and, together with the evidence, be sufficient to provide protection against subsequent prosecution for the same offense. United States v Emerson, (No. 77), 1 CMR 43, decided November 14, 1951."

We thus concluded that Schumacher was not in any way misled by the allegation of time, for such practice was recognized and accepted in both the military and Federal systems. This basic principle has been announced in many cases since. United States v Sell, 3 USCMA 202, 11 CMR 202; United States v Steele, 2 USCMA 379, 9 CMR 9; United States v Lorenzen, 6 USCMA 512, 20 CMR 228; United States v Williams, 12 USCMA 683, 31 CMR 269.

We are now asked to give justification to the trial defense motion by declaring adultery not to be a continuing offense. The corollary being that the specification was inadequate. In turn, the Government's view of the proceeding is that this issue has been resolved, for all intents and purposes, by our cases of *Frayer* and *Means,* supra.

There is a paucity of cases covering this vexing question. Yet, it must be said that there are cases available that hold adultery not a continuing offense; that each act of adultery constitutes a separate offense. Cf. State v Thompson, 31 Utah 228, 87 Pac 709; State v Sheffield, 45 Utah 426, 146 Pac 306

(1915); Burns v State, 17 Okla Crim 26, 182 Pac 738 (1919).

State v Thompson, supra, the most precise of the three here mentioned, contained an indictment alleging the charge of adultery " 'on the 13th day of February, 1905, and on divers other days, and thence continuously between the said 13th day of February, 1905, until the 1st day of August, 1905.' " This indictment was deemed adequate in that it alleged an adultery on a specific day with the remainder of the charge being mere surplusage—adultery not being a continuous offense.

In any event, Coyne v Coyne, 187 Misc 569, 64 NYS2d 567, reversed, 271 App Div 895, 67 NYS2d 488, affirmed, 297 NY 927, 79 NE2d 748, a divorce action, is a case to the contrary. It was there held that adultery was a continuous offense—at least for purposes of applying the statute of limitations.

The holdings of these cases seem somewhat incongruous cast in the light of offenses having consanguinity. For example, it has been held that "time" is not a material ingredient of the offense of incest. Haller v State, 217 Ark 646, 232 SW2d 829 (1950); Salyers v Commonwealth, 255 SW2d 605 (Ky) (1953). The same is true of carnal knowledge (State v Jordan, 6 Wash 2d 719, 108 P2d 657 (1940)); and of rape (State v Lee, 202 Ore 592, 276 P2d 946 (1954); People v Fremont, 47 Cal 2d 341, 117 P2d 891 (1941)). Compare, too, the indecent liberties specification of United States v Schumacher, supra.

Be that as it may, we are not bound to resolve the question at hand within the precise terms announced by these adversaries. That is to say, we may test the worth of a specification on the basis of whether or not it, coupled with the evidence relative thereto, demonstrates a "course of conduct." Examine United States v Frayer, supra, and United States v Means, supra; as well as United States v Maynazarian, 12 USCMA 484, 485, 31 CMR 70, where we acknowledged:

". . . Under the law of this Court, it is deemed proper to allege the commission of a crime over a period of time or between specified dates. United States v Means, 12 USCMA 290, 30 CMR 290."

In United States v Paulk, 13 USCMA 456, 32 CMR 456, we found duplicitous pleading under an allegation that accused stole a specific sum of money. Though the averment was proper on its face, considered in the light of the evidence, it embraced within its confines three separate larcenies. We thereupon distinguished Means, supra, noting that a majority of the Court had found the specification alleged a "course of conduct."

In United States v Davis, 16 USCMA 207, 36 CMR 363, we again distinguished Means, supra, in finding duplicitous a single specification of larceny containing three separate offenses of that crime.

Turning now to the cases most discussed, we find that United States v Frayer, supra, concerned, among others, the offense of adultery covering the period from September 1957 to November 1958. At trial, defense counsel moved to amend this specification, for the statue of limitations, not duplicity, was involved. We observed:

". . . Implicit in the motion is an assumption that each act of adultery is a separate and distinct offense." [United States v Frayer, supra, at page 603.]

This assumption did not give us pause, however, for we concluded:

". . . The situation is generally analogous to that relating to the statute of limitations. It is the general rule as regards acts of a continuous nature that the statute of limitations bars proceedings on those as to which the statute has run, but there is no relation back to the date of the first act so as to bar proceedings on those acts committed within the period of limitations." [United States v Frayer, supra, at page 603.]

Subsequently, in Means, supra, a marihuana case, the question of duplicity did in fact arise. In that instance the specification alleged the

wrongful use of marihuana "at Austin, Texas, and Bergstrom Air Force Base, Texas, from on or about 1 April 1959 to on or about 30 September 1959." In finding the specification adequate we first removed any doubt as to the validity of the adultery specification in United States v Frayer, supra, and then cited the following statement by the Court of Appeals, 8th Circuit, in Hanf v United States, 235 F2d 710, 715 (1956):

"'. . . The rule against duplicitous pleading is not offended by a count charging more than one act if the acts were part of a transaction constituting a single offense. Certainly, any similar prosecution by the government against this appellant for a violation committed at any time between the dates indicated in Count 1 of the indictment would be a prosecution for the same offense, and would be promptly dismissed.'"

Continuing, we stated that:

"The Korholz and Hanf opinions express our views in the matter. The specification is clearly sufficient to inform the accused of the particular act which he committed; namely, continued wrongful use of marijuana. The allegations of place and time are general, but they can be considered with the evidence in the record of trial; together they would be entirely sufficient to protect the accused against another prosecution for the same acts. United States v Marker, 1 USCMA 393, 3 CMR 127; see also United States v Sell, 3 USCMA 202, 11 CMR 202." [United States v Means, supra, at page 294.]

In sum, we find the rationale of these cases dispositive of the issue. It is hopeful that such an approach will, as to sexual offenses, permit a degree of consonance not now seemingly present. We are certain that Sergeant Carter suffered no harm in the denial of his motion. The crime does not have "degrees" of punishment. The time as alleged covered only the period of the rendezvous and counsel conceded that he was prepared to defend each meeting. This type of allegation forever saves accused from prosecution for the encompassed individual act. In the words of Maynazarian, supra, "a necessary corollary to the use of such pleading is the fact that an accused may plead former jeopardy to any specific act involved in the general count."

Accordingly, the decision of the board of review is affirmed.

QUINN, Chief Judge (concurring):

Status of Forces Agreements do not merely define relationships between the United States and the host nations; they also provide many special protections to the accused. For example, there is an express provision against double jeopardy (see United States v Cadenhead, 14 USCMA 271, 34 CMR 51); and, by virtue of the provision for mutual assistance, Article 32 testimony of a civilian witness who refuses to appear in person at the trial is not admissible in evidence unless the assistance of the authorities of the host nation was sought and proved fruitless. United States v Burrow, 16 USCMA 94, 36 CMR 250. In my separate opinion in United States v Murphy, 7 USCMA 32, 21 CMR 158, I indicated that if an American serviceman is compelled by military authorities, acting under the Agreement, to testify in a court of the host nation, he may have a right to assert the privilege against self-incrimination, despite the general rule that a witness cannot refuse to testify because his testimony might reveal his complicity in a crime against another sovereign. In this case, there is testimony by the Chief of the International Affairs Section in the branch office of the Staff Judge Advocate (East), United States Army Communications Zone, Europe, to the effect that, if American military officials had not had previous liaison with the French authorities about the search, it "would have been conducted in violation of the provisions of the NATO Treaty." In my opinion, therefore, the accused can rely upon the Status of Forces Agreement to challenge the legality of the search of his home.

At trial, the accused contended the search of his apartment was in violation of the Agreement because there was no

evidence it accorded with any procedure established by the French Ministry of Justice and the United States representative, Major General Webster Anderson. In this Court, the objection has been broadened to include a contention that, under French law, the search could be conducted only under a warrant issued by a *juge d' instruction,* or examining magistrate. In my opinion, neither aspect of the objection has merit.

Without repeating all the pertinent provisions of the Agreement and supplementary documents, which are set out sufficiently in the principal opinion, I am satisfied the search conformed to them. The basic requirement, under Article VII, section 10*(b)* of the Agreement, is that there be liaison between the American authorities and the authorities of the receiving state. The evidence indicates that for many years this provision has been construed as authorizing local civilian authorities to effectuate appropriate arrangements as to their own areas. Arrangements to cover American leased housing were made in 1964 in a meeting between the Commissioner of Police of Verdun and local military officials. At this meeting, authority to search housing owned or wholly leased by the United States for its forces in Verdun was completely defined. Among other things, it was agreed the military authorities could search without French assistance whenever the "offense suspected was of either sole or primary interest to the American authorities"; a theft "between Americans" was listed as an offense of primary American concern. The 1964 decision was specifically confirmed by the Vendun Commissioner of Police when he was apprised of the proposed search of the accused's apartment. The search, therefore, was conducted in compliance with the Status of Forces Agreement. See United States v Cadenhead, supra.

As to the necessity for a warrant by a *juge d'instruction,* the Government contends that, since no evidence was presented to the law officer, the accused's citations to French law should not be considered by this Court. See

Manual for Courts-Martial, United States, 1951, paragraph 147*(b)*; United States v Carey, 11 USCMA 443, 29 CMR 259. At trial, Government counsel indicated he was prepared to call a French official to testify as to French law, but unfortunately the offer was apparently overlooked in the arguments on the issue, and no direct evidence of the French law on search and seizure was admitted. However, there is testimony to the effect that the Commissioner of Police of Verdun had agreed with the American authorities that no French warrant was required to search the accused's apartment. There is also testimony that local police chiefs had always "acted for their own jurisdictions," in determining whether a search of the quarters of a member of the visiting forces was primarily governed by French law. It can, therefore, reasonably be inferred that the search in this case was proper under French law. Nothing in the provisions of French law cited by the accused is inconsistent with that inference. In any event, assuming that the Commissioner of Police was mistaken in his interpretation of the law of his country and that French law required a warrant by a *juge d' instruction,* the failure to obtain a warrant did not make the search unreasonable or deprive the accused of military due process.

Previous to the search, the American military authorities had been specifically assured by a local civilian official, who traditionally had exercised authority in this area of the law, that, since the housing unit was rented by the United States for its military personnel and the offense involved only the American armed forces, no civilian authorization to search was necessary. Also, the military law enforcement agents had obtained authority to search from an officer competent to grant such authority as to premises directly subject to military control. This authorization was predicated upon probable cause and otherwise met the requirements for a valid search authorization under military law. In these circumstances, I perceive nothing more that the military authorities could do to protect the accused against an unrea-

288

sonable search and seizure. United States v Best, 76 F Supp 857 (DC Mass) (1948), affirmed, 184 F2d 131, 138 (CA1st Cir) (1950), certiorari denied, 340 US 939, 95 L ed 677, 71 S Ct 480 (1951). Cf. United States v DeLeo, 5 USCMA 148, 17 CMR 148. I, therefore, agree with the principal opinion's determination that the law officer's ruling on the defense objection to the search and seizure was correct.

I concur in the principal opinion's disposition of the issue as to the adultery specification, and I join in affirming the decision of the board of review.

FERGUSON, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

I agree with Judge Kilday's scholarly discussion of the issue regarding search and seizure and the determination that no illegality is to be found here. A search conducted by American officers for the recovery of the fruits of crime, based on probable cause and authorized by a proper person, is to be governed by American law when its product is tendered in evidence at a United States court-martial. It is to the United States Constitution that we must look in measuring the exercise of Federal power, and by its standards we must be guided in the receipt of evidence on behalf of the prosecution. Here, the search satisfied those requirements and, under the facts presented, we need look no further.

As to the other question before us, however, I must express stringent disagreement. I cannot join in holding an accused entitled to no relief when faced with a specification which charges him with the continual and repeated commission of criminal acts of adultery between July 1, 1964, and October 20, 1964. An adultery count must "state the time and place of the commission of the alleged offense with precision and certainty." 2 Am Jur 2d, Adultery and Fornication, § 22. Otherwise, as here, the accused is met with the need to establish his defense over a period of several months as to contacts with his alleged paramour, while the Government is relieved, by its a continuando pleading, from the burden of meeting

any alibi or other defense to specific suspicious or incriminating circumstances. That is exactly the situation here, for in moving to have the specification made more definite and certain as to time, counsel noted the impossibility of answering the allegations as to misconduct when they are spread over 111 days, although he was prepared to contest any specific occasion on which the Government was able to demonstrate a relationship between the parties.

The authorities seem well agreed that a specific allegation of time is of the essence in charges of adultery, and no precedent has been shown to support the shotgun-type of pleadings involved here. See 2 Am Jur 2d, supra, § 22. Thus, in State v Thompson, 31 Utah 228, 87 Pac 709 (1906), the accused was charged with adultery " 'on the 13th day of February, 1905, and on divers other days, and thence continually between the said 13th day of February, 1905, until the 1st day of August, 1905.' " As to the portion of the information charging the offense on a continuing basis, the court declared, at page 710:

" . . . Every information or indictment, to be adequate, must allege a day and year on which the offense was committed. *It is inadequate to charge an offense committed at some indefinite time between two specified days. . . . The allegation that the defendant committed the offense at an indefinite time on divers days between two specified days does not charge any offense. . . .*" [Emphasis supplied.]

See also State v Sheffield, 45 Utah 426, 146 Pac 306 (1915), and Burns v State, 17 Okla Crim 26, 182 Pac 738 (1919), as pointing up the distinction between adultery as a single offense and unlawful cohabitation as a continuing crime. See also Annotation, 74 ALR 1361, and 2 Am Jur 2d, supra, § 22.

Only Coyne v Coyne, 297 NY 927, 79 NE2d 748 (1948), is cited as authority to the contrary. The court there, however, dealt with a civil divorce action, in which it was manifestly proper to set forth different

instances of adulterous conduct. Moreover, it was faced with the question whether such complaint was barred by the statute of limitations. An act within the statute being found, the judgment below was affirmed. Manifestly, this constitutes no authority for the proposition that a criminal complaint may be turned into a barrage of indefinite and vague charges as to accused's relationship with his alleged paramour over a period of months.

Turning to our own cases, it is clear they likewise do not sustain the pleading here. United States v Frayer, 11 USCMA 600, 29 CMR 416, involved a jurisdictional issue and we determined no more than that the specification alleged misconduct within accused's current enlistment and, hence, subjected him to punishment therefor. Nor did the accused there make any application for relief or assert, as did Carter, that it was not possible for him minutely to account for his whereabouts over a period of 111 days. United States v Means, 12 USCMA 290, 30 CMR 290, involved the use of marihuana over a period of time. And, as we recently noted in United States v Davis, 16 USCMA 207, 36 CMR 363, at page 208, that decision was premised on the use of marihuana as a course of conduct, whereas, in Judge Latimer's words, "a single use of marihuana may or may not be discrediting or detrimental to good order." United States v Means, supra, at page 295. As we have seen, however, adultery is not a course of conduct. It is a single act, and its very occurrence is made punishable, without regard to any continuation of the relationship. Thus, even the holding in Means, supra, offers no support for the result reached today.

Finally, the broadness of the pleading necessarily leaves unresolved the question whether two-thirds of the court members concurred in finding the accused guilty of the same act. Under the allegation of the long period involved, one may have been convinced by the testimony as to the accused's joint occupancy of the apartment with a woman over that period of time. Another may have inferred an act occurred upon the entry on the lease. Others

may have found such act on the basis of Lieutenant Franson's testimony as to what he observed on his visit, or based their conclusions on the other circumstances presented. The fact of the matter is that the specification includes so many offenses that, despite reference to the record or elsewhere, there is no way of determining whether the required number of members predicated guilt on the same basis. Therefore, as we said in United States v Paulk, 13 USCMA 456, 32 CMR 456, at page 457:

"The specification thus violates one of the rudimentary principles of pleading, for, as noted by the Manual for Courts-Martial, United States, 1951, 'One specification should not allege more than one offense either conjunctively or in the alternative.' . . . See also United States v Parker, 3 USCMA 541, 13 CMR 97; United States v Autrey, 12 USCMA 252, 253, 30 CMR 252, 253; Federal Rules of Criminal Procedure, Rule 8a; and Kotteakos v United States, 328 US 750, 90 L ed 1557, 66 S Ct 1239 (1946)."

In sum, then, I would follow the authorities, cited *supra,* and require the Government to allege the occurrence of adulterous misconduct on a day certain and thereby permit the accused to avoid being faced with a cloud of charges within the guise of a single count. State v Thompson, supra. Only then will he be able to meet the evidence against him and present some semblance of a defense. Adultery, like larceny, is but a single offense and it should be charged as such. United States v Williams, 12 USCMA 683, 31 CMR 269; United States v Paulk, supra. Neither convenience to the Government nor distaste for the accused's actions should lead us to approval of so broad an allegation as here presented. I, therefore, note my dissent to this portion of the opinion.

I would set aside the findings of guilty of adultery, order that charge dismissed, and remand the case to the board of review for reassessment of the sentence on the remaining charge.