**UNITED STATES, Appellee,**

v.

**J. C. STOKES, Technical Sergeant U. S. Air Force, Appellant.**

Dkt. No. 38,678.
ACM 22525.

U. S. Court of Military Appeals.

Jan. 18, 1982.

For Appellant: *Captain Patrick A. Tucker* (argued); *Colonel Larry G. Stephens* (on brief).

For Appellee: *Captain George D. Cato* (argued); *Colonel James P. Porter, Major Robert T. Mounts* (on brief).

*Opinion of the Court*

EVERETT, Chief Judge:

A general court-martial convened in Spain convicted the appellant, contrary to his pleas, of wrongful sale of 4.75 kilograms of hashish and of conspiracy to make that sale, in contravention of Articles 134 and 81, Uniform Code of Military Justice, 10 U.S.C. §§ 934 and 881, respectively. He

was sentenced to a bad-conduct discharge, confinement at hard labor for 4 years, forfeiture of $100 pay per month for 24 months, and reduction to the lowest enlisted grade. The convening authority approved these results and the United States Air Force Court of Military Review affirmed. *United States v. Stokes*, 8 M.J. 694 (A.F.C. M.R.1979).

This Court granted review (9 M.J. 122) of the following issues raised by appellate defense counsel:

## I

WHETHER THE COURT–MARTIAL WHICH TRIED THE APPELLANT WAS WITHOUT JURISDICTION BECAUSE THE APPELLANT HAD ALREADY BEEN TRIED IN SPANISH CONTRABAND COURT.

## II

WHETHER THE MILITARY JUDGE ERRED WHEN HE ADMITTED EVIDENCE OF UNCHARGED MISCONDUCT.

## I

The offenses of which the appellant was convicted occurred on June 1, 1978, the same date on which he was apprehended by Spanish and American authorities. Under Spanish law, Stokes faced action in three distinct tribunals: the Court of Instruction, the Contraband Court, and the Court of Social Rehabilitation and Dangerousness. The American authorities promptly requested Spain to waive its primary jurisdiction in all three courts. Spain, while doing so in the Court of Instruction, declined to do so in the other two. Consequently, the appellant was tried in the Contraband Court on June 28, 1978. On December 13 or 14, 1978, he was notified that the Contraband Court had fined him 545,200 pesos ($7,788.57).[1]

When the appellant's court-martial began on February 8, 1979, his defense counsel moved "to dismiss the charges and specifications . . . upon the ground that the court-martial is without jurisdiction to try the accused, due to the fact that he's already been tried and sentenced by the Government of Spain, and that the basis of the motion is Article XXII of the Agreement between Spain and the United States of America of January 24th, 1976 [T.I.A.S. No. 8361]." After taking judicial notice of several documents relating to this agreement and to appellant's trial, and after hearing extensive testimony from Senor Juan Aguilar, a Spanish lawyer who was a legal adviser to the Joint United States Military Group in Spain and who qualified as an expert witness on the nature of the Spanish judicial system and its relationship to the treaty between Spain and the United States, the military judge denied the motion.

## II

■ Although the Fifth Amendment protects against double jeopardy, its shield only extends to prosecutions by the same sovereign. Thus, it is well established "that a federal prosecution does not bar a subsequent state prosecution of the same person for the same acts, and a state prosecution does not bar a federal one." *United States v. Wheeler*, 435 U.S. 313, 317, 98 S.Ct. 1079, 1082, 55 L.Ed.2d 303 (1978) (footnote omitted) (federal court and Indian tribal court). *Accord, Abbate v. United States*, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); *Bartkus v. Illinois*, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959). However, successive prosecutions by different sovereigns have not been favored. Thus, the Attorney General has sought to restrict federal prosecution after a state trial for the same misdeeds, *cf. Rinaldi v. United States*, 434 U.S. 22, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977); *Petite v. United States*, 361 U.S. 529, 80 S.Ct.

---

1. A stipulation recites: "The Court of Social Rehabilitation is concerned with offenses against public health and decency. Normally in cases of foreigners the sentence imposed by the court consists of deportation from Spain.

However, in the case of TSgt Stokes, the prosecutor is requesting a sentence of one year in labor camp and three years under the vigilance of Spanish authorities. A sentence has not yet been imposed by this court." (App. Ex. VI)

450, 4 L.Ed.2d 490 (1960), and a number of states have enacted statutes[2] which forbid a state prosecution after a federal trial for the same misconduct. Likewise, in negotiating the NATO Status of Forces Agreement and similar treaties, express provision has been made for protection against successive trials by the receiving state and the sending state. *See, e.g.,* Article VII § 8, Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces, 4 U.S.T. 1792, 1802, T.I.A.S. No. 2846 (effective date August 23, 1953) (NATO SOFA).

When the Uniform Code was first enacted, it had not been firmly established that service members were entitled to the Fifth Amendment protection against former jeopardy. *Cf. Wade v. Hunter,* 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949). However, Article 44(a) of the Code, 10 U.S.C. § 844(a), mooted the issue by commanding, "No person may, without his consent, be tried a second time for the same offense." Undoubtedly this provision was not intended to abolish the dual-sovereignties rule that had been applied in interpreting the constitutional guarantee against successive trials for the same offense. Thus, trial by a court-martial is barred by the Code only if the accused has already been tried in a court which derives its authority from the Federal Government. *Grafton v. United States,* 206 U.S. 333, 27 S.Ct. 749, 51 L.Ed. 1084 (1907); *cf. Waller v. Florida,* 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1970). But a trial by court-martial is not barred if the earlier trial was by a state or foreign court. *Cf. United States v. Wheeler, supra.* In this connection, paragraph 215*b* of the Manual for Courts-Martial, United States, 1969 (Revised edition), explains:

> The commission of certain acts may constitute an offense under the code and also an offense under other Federal criminal statutes. These offenses are con-

sidered to be the same in the sense of Article 44... However, the commission of certain acts may also constitute an offense under the code and an offense under State or foreign law. These offenses are not the same within the sense of Article 44. Thus, trial by a State or foreign court does not bar a subsequent trial by court-martial. However, the authority to try an accused by court-martial under those circumstances may be limited by regulations of the Secretary of a Department. Additionally, the authority to try an accused by court-martial following a trial in a foreign court may be limited by treaty or international agreement.

Appellant contends that his prosecution was precluded by regulations of his service. In this connection he calls to our attention paragraph 15b of USAFE Regulation 110–1 (August 20, 1968), which states: "As dual prosecution rarely serves the ends of discipline or justice, US military authorities will not institute disciplinary measures when the host country has exercised jurisdiction in the case without the prior approval of the component commander of the accused." We note several defects in this argument. First, the regulations relied on were promulgated by a theater commander, rather than by the Secretary of the Air Force, as contemplated by paragraph 215*b*. Second, this directive seems akin to the "Petite policy" of the Attorney General (*cf. Petite v. United States, supra*), so violations of the directives will not preclude a second prosecution. *Cf. United States v. King,* 590 F.2d 253 (8th Cir. 1978), *cert. denied,* 440 U.S. 973, 99 S.Ct. 1538, 59 L.Ed.2d 790 (1979). Finally, the regulation refers to a "prosecution," and, as will be discussed later, we doubt that the proceedings in the Contraband Court constituted a "prosecution" within the contemplation of the regulation.

Of course, the characterization of the trial in the Spanish Contraband Court is also

---

**2.** *Cf.* Ariz.Rev.Stat., § 13–112; Code of Ga. Ann., § 26–507(c); Ill.Rev.Stat., ch. 38, § 3–4(c); Kan.Stat., § 21–3108(3); Minn.Stats.Ann., § 609.045; Utah Code Ann., § 76–1–404. *People v. Abbamonte,* 43 N.Y.2d 74, 371 N.E.2d

485 (1977) (same act or criminal transaction); *Journey v. State,* 521 S.W.2d 210 (Ark.1975) (same course of conduct and of the same character); *Epps v. Commonwealth,* 216 Va. 150, 216 S.E.2d 64 (1975) (same act).

involved in the disposition of appellant's contention that the treaty with Spain—which, like the NATO Status of Forces Agreement, contains double jeopardy guarantees—barred his trial by court-martial.[3] Two provisions of that treaty are central to this contention. Article XXII of the agreement [4] states:

> *Where an accused has been tried in accordance with the provisions of this Agreement* either by the military authorities of the United States or the authorities of Spain and has been acquitted, or has been convicted and is serving, or has served, his sentence, or his sentence has been remitted or suspended, or he has been pardoned, *he may not be tried again for the same offense* within the territory of Spain by the authorities of the other state.

(Emphasis added). The subsequent article, Article XXIII, sets forth certain protections to be accorded an American serviceperson in Spain when the serviceperson "is arrested, detained, or otherwise prosecuted by Spanish authorities, *in criminal or quasi-criminal (cases of contraband) proceedings.*" (Emphasis added). Thus, an accused must be advised of the specific charges and of his legal rights, and the Spanish authorities must promptly notify American authorities, who may then communicate with the serviceperson and "be present throughout the investigative and judicial phases of the entire proceedings."

The appellant argues that the specific reference in Article XXIII to cases of contraband as "quasi-criminal" must be read to reflect an intent by the treaty's draftsmen to include these cases within Article XXII's bar to subsequent prosecution by the United States for the same offense. The inquiry necessitated by appellant's contention is two-fold: 1) Were proceedings in the Spanish Contraband Court intended to be included within the provisions of Article XXII of the agreement; 2) if so, was appellant's subsequent court-martial for "the same offense" as the violation charged in the earlier Contraband Court proceeding? We answer both questions in the negative.

### A

Senor Aguilar testified at some length about the structure of the Spanish judicial system and how violations of law by United States servicepersons are handled within that system pursuant to the Treaty. According to him, whenever a service member's conduct violated Spanish law and Spain possessed primary jurisdiction under the treaty, the Mixed Commission decided what course to follow: Whether to retain jurisdiction entirely in Spanish courts, to relinquish all jurisdiction to the United States, or to split jurisdiction, as was done in appellant's case. This Commission has six members: The president is a Magistrate of the Spanish Supreme Court, as are two other members; another member is a Magistrate of the National *Audiencia*—the court of general criminal trial jurisdiction; a fifth is the General Judge Advocate of

---

**3.** Appellate government counsel insist that appellant has no standing to invoke the provisions of the agreement with Spain. In this regard, they rely on Judge Kilday's opinion in *United States v. Carter*, 16 U.S.C.M.A. 277, 36 C.M.R. 433 (1966). However, in view of the other opinions in that case, *Carter* is not adequate precedent for the proposition that an accused cannot claim protection against a trial by court-martial when such a trial would violate a treaty with the country which previously tried him and within whose boundaries the court-martial is to be convened. The Manual reference in paragraph 215b to limitations imposed "by treaty or international agreement" tends to suggest that standing should be granted. Moreover, since the United States—which usually is the "sending state"—traditionally has pressed for the recognition of procedural rights under Status of Forces Agreements, it

seems unlikely that our negotiators intended for such agreements to be interpreted in a way which would tend to restrict the availability in criminal trials of the rights which are guaranteed by those agreements. Indeed, some have viewed the procedural safeguards in the NATO Status of Forces Agreement as the precursor to an international Bill of Rights. *See* Ellert, *NATO "Fair Trial" Safeguards: Precursor to an International Bill of Rights* (1963).

**4.** This Article does not "prevent ... [American] military authorities ... from trying a ... [service] member ... in Spain for any violation of rules of discipline arising from an act or omission which constituted an offense for which he was tried by the authorities of Spain."

the Spanish Army; and the last member is a lawyer from the office of a United States Air Force or Navy staff judge advocate's office.

If Spain retains jurisdiction either entirely or in part, three different Spanish tribunals may become involved. The first is the Court of Instruction, the criminal court of first instance, which has the authority to impose up to three years' confinement. In cases of a more serious offense where exposure to a greater maximum punishment is appropriate, this court will "instruct" the case to the National *Audiencia*. The second court is the Court of Social Rehabilitation and Dangerousness, whose purpose is to declare an accused to be dangerous and to take steps to avoid his dangerousness or rehabilitate him. While the usual penalty for aliens is expulsion from Spain, this court also may send an individual to "a special prison" where, in the case of involvement with drugs, he may be "disintoxicated, and rehabilitated, and nothing else."

The third tribunal is the Court of Contraband, which is entirely an administrative court. Unlike the other two courts, it is not headed by a "judge," but by a government official whose function is to impose fines for "contraband violations." An individual brought before this court is not called an "offender"; instead his act is referred to as an "infraction"—*i. e.*, an administrative violation. Thus, if someone took a radio from Madrid to some other place in Spain without paying the necessary customs rates, the Court of Contraband would fine him for this violation.

Before Spain's new Constitution became effective in late 1978, this court was authorized to commute a fine to imprisonment if the fine could not be paid, but Article XXV, paragraph 3, of that document nullified this power by providing: "The Civil Administration may not impose sanctions which directly or in a subsidiary manner imply deprivation of freedom." Subsequent to this constitutional change, an order of the Contraband Court states that, pursuant to this change, imprisonment can no longer be imposed to collect a fine and that this limita-

tion is retroactive. While the appellant was tried in Contraband Court *before* the effective date of the new Constitution, his fine was not adjudged until *after* that date. Accordingly, Stokes was never in jeopardy that his fine might be commuted to imprisonment—even for inability to pay.

Senor Aguilar testified that, as construed by both Spanish and American authorities, Article XXII of the treaty applies only to offenses under the Spanish Criminal Code, and that, of the three Spanish courts, only the Court of Instruction plays a role in the Spanish criminal justice system. According to Aguilar, the Court of Social Rehabilitation and Dangerousness also is judicial in character, but the Court of Contraband is entirely within Spain's administrative law system. Accordingly, an adjudication in the Court of Instruction is a "conviction" and the remedy is a "sentence," while in the Court of Contraband, the adjudication is only an "administrative decision."

There is support for Aguilar's view in the treaty itself and in related documents. Article XXII obviously refers to court actions which conform to the model of a criminal trial. For instance, it addresses situations "[w]here an accused has been tried . . . and has been acquitted, or . . . convicted" and, if the latter, either "is serving, or has served, his sentence, or his sentence has been remitted or suspended, or he has been pardoned." These are words of art familiar in criminal procedure. On the other hand, documents adverting to the treaty consistently refer to the Contraband Court in the phraseology of administrative, not criminal, law. For instance, paragraph 9 of Policy Directive Number 110.5 of the Joint U. S. Military Group/Military Assistance Advisory Group, dated June 1, 1974, states that "[c]ases processed by Contraband Tribunals . . . [were] not [at that time] passed through the Mixed Commission for . . . a decision as to jurisdiction, since they are administrative rather than penal actions under Spanish law." Paragraph 11 of that directive recognizes that "normal criminal proceedings" are initiated in the Court of Instruction.

Appellant responds that, even so, the test is not how the Spanish judicial system is in fact organized, but rather how the parties to the agreement intended the Contraband Court to be characterized—*i. e.*, whether the parties intended that proceedings in the Contraband Court be among those which, if pursued by Spain, would bar subsequent trial by the United States for the same offense. Appellant contends that the reference in Article XXIII to contraband proceedings as "quasi-criminal" indicates unmistakably that the parties to the agreement intended such a result.

When the most recent agreement was signed by Spain and the United States in 1976, the only military precedent addressing this subject was *United States v. Reed*, 33 C.M.R. 932 (A.F.B.R.1963). There the accused had been tried by court-martial under Article 92 of the Code, 10 U.S.C. § 892, for wrongful sale of cigarettes and whiskey. He protested that under Air Force policy his previous trial by the Contraband Court for the same activity barred the court-martial. The Air Force Board of Review, in resolving the merits of this claim against the accused, did so on three grounds.[5] First, violating a regulation is purely a military offense wholly distinct from the misconduct involved in failing to pay local custom duties; so the accused had not been convicted by court-martial and fined by Spain for the "same offense." Second, the Spanish Fraud and Contraband Tribunal was not a criminal court under the Board's analysis of the Spanish Law of Fraud and Contraband. Finally, the agreement which then existed between the United States and Spain only restricted the host country from criminally prosecuting an American service member whom the United States already had prosecuted, not vice versa.

Against this backdrop, the parties negotiated the 1976 agreement. That document reaffirms the first rationale employed in

*Reed* by expressly providing in Article XXII that the United States might try a service member for violating "rules of discipline" even if the Spaniards had already tried him for criminal conduct. On the other hand, the third ground for the Board of Review's decision was undercut: Article XXII clearly is reciprocal, so that if either party in exercising primary jurisdiction conducts a criminal trial of an American service member, the other party is barred from a similar prosecution. Under the 1976 treaty, what then remains of the third ground for the decision in *Reed*?

As Senor Aguilar testified, the reference to cases of contraband as "quasi-criminal" in Article XXIII was inserted in the 1976 agreement at the insistence of the United States. It might well be argued that a reason for this change was to remove one ground for the *Reed* decision. After all, the American representatives, when entering the negotiations which led to the agreement, were faced with a clear ruling that under Spanish law an action in the Contraband Court was not a criminal proceeding, but only a civil administrative proceeding and that, if the United States wished to protect its military personnel from exposure to trial both in the Spanish Contraband Court and in an American court-martial, the most feasible way to do so was for the new agreement to characterize contraband proceedings as "quasi-criminal." After all, the treaty could not change Spanish law, and to describe Contraband Court proceedings in the agreement as "criminal" might well have been unacceptable to Spain.

Despite this ingenious argument, we think it just as likely that Article XXIII's reference to contraband cases as "quasi-criminal" was simply an effort in recognition of the potential consequences of such a proceeding to afford additional protections to an American service member brought to

---

**5.** Preliminarily, the Board found that as a matter of law the appellant's claim was not a matter "sounding in former jeopardy." *United States v. Reed*, 33 C.M.R. 932, 937 (A.F.B.R. 1963). It then found that if it did sound in

former jeopardy, the defense was waived by failure to raise it at trial. Finally, the Board concluded that in any event the claim was deficient on the merits.

the bar of the Contraband Court.[6] Paragraph 9 of Policy Directive Number 110.5, *supra*, implies as much, for, as mentioned earlier, that paragraph initially recognizes that actions in Contraband Court are, under Spanish law, "administrative rather than penal." Thereafter, the text continues:

> Nevertheless, the trial safeguards guaranteed in Article XXIII of the Agreement in Implementation are applicable to contraband proceedings, and since contraband hearings may result in substantial fines or confinement in the event of nonpayment of the fine, the trial observer policy expressed in paragraph 7 above is applicable.

We are persuaded that if the parties to the 1976 agreement had intended to include actions in the Contraband Court within the terms connoting criminal trials found in Article XXII, it would have done so directly rather than rely on an amorphous reference to such cases as "quasi-criminal" in Article XXIII. Accordingly, appellant's trial by court-martial was not barred by any provision of the Treaty of Friendship and Cooperation between Spain and the United States even though earlier he had been subjected to proceedings in the Spanish Contraband Court.

### B

The charges confronting appellant in his court-martial were conspiracy to sell and sale of marihuana, while the action in Contraband Court involved a customs violation. The testimony of Senor Aguilar concerning transportation of a radio within Spain (referred to earlier in this opinion) makes it clear that the concern of the Contraband Court is not the inherent nature of the

particular item, but rather whether the appropriate customs duties have been paid on it. Accordingly, while both sets of charges arose out of the same incident, their gravamen were entirely distinct and addressed different social concerns. Thus, they constituted different offenses. *Cf. United States v. Washington*, 1 M.J. 473 (C.M.A. 1976). In this light, even if proceedings in the Contraband Court were treated as included within the ambit of Article XXII of the treaty, in appellant's case those proceedings were not for the "same offense" as any of those charged in his court-martial.

### III

### A

The primary source of evidence against appellant was the testimony of Joseph Rogan, a Special Agent of the Air Force Office of Special Investigations (OSI), stationed at Torrejon Air Base, Spain. Generally, the testimony of Agent Rogan and that of appellant were diametrically opposed on all important points concerning the issue of appellant's participation in the transaction charged.

Rogan testified that his initial dealings were with an Airman Sponseller, who drove him to an outdoor cafeteria in a park in Zaragoza, Spain, where they were to meet an individual named "John." John was to have the hashish. When they arrived at the bar, Sponseller talked briefly with a black man identified at trial as appellant; thereafter Sponseller introduced the man to Rogan as "John."

Subsequently, appellant left the bar to make a phone call regarding the hashish; upon returning, he stated that Rogan would

**6.** Appellant cites those protections which the treaty now provides to persons tried in the Contraband Court as a further indication of the criminal nature of those proceedings. However, this view ignores the fact that even in the United States many administrative proceedings—such as those involving military administrative discharges, deportation, or a loss of a driver's license—bear similar protective trappings, yet are not "criminal" in nature. Indeed, the fact that our domestic system is replete with such examples of noncriminal proceedings

which offer generous safeguards buttresses the conclusion that even though American negotiators insisted on certain protections for servicepersons tried in Contraband Court, they did not necessarily view those proceedings as criminal. Some of the difficulties in characterizing foreign-court proceedings for purposes of the Status of Forces Agreements are revealed by cases like *United States v. Cadenhead*, 14 U.S. C.M.A. 271, 34 C.M.R. 51 (1963), and *United States v. Sinigar*, 6 U.S.C.M.A. 330, 20 C.M.R. 46 (1955).

first have to give him the $10,500 purchase price before Stokes could get him the hashish. When Rogan protested, appellant told him "the deal can't go down unless you deal my way." Appellant, Sponseller, and Rogan continued their negotiations at the bar for a period of time until appellant said that he was getting nervous about their location. They moved to a park bench, where their negotiations went on for several more minutes.

At that point, appellant said, "Well, let's go somewhere else and do the deal." They left the park in Sponseller's car with Stokes in the front passenger seat and Rogan in the rear. They drove around the city for some time, during which appellant directed Sponseller to make several evasive turns to ensure that they were not being followed. Finally, appellant instructed Sponseller to stop the car, back up about 20 or 30 yards, and park in front of a bar.

Once inside the bar, Stokes again asked Rogan to give him the money, after which appellant would get the hashish and bring it back. Again Rogan refused—asserting that he thought Stokes was just trying to "rip off" the money and would not bring the hashish. After this exchange, appellant left the bar for a short time. When he returned, he suggested that Rogan give the money to Sponseller so that Sponseller could go to the corner and make the deal. Rogan agreed to these terms on the condition that he could follow Sponseller in order to keep an eye on his money. Appellant agreed and asked Rogan for $1,000 as his share of the deal. Rogan removed $1,000 from the bag of money, but he put it in his own jacket pocket and told appellant that he had to "see the hash" first. Appellant then commented, "I think that's all you want to do, is see the hash and then bust my ass."

Rogan then gave the remainder of the money to Sponseller and both Rogan and appellant followed Sponseller out of the

bar, down the street, and around the corner, where Sponseller approached a white automobile. When Sponseller handed the money to a man in the front passenger seat of the car, Rogan approached the driver's door and signalled for the surveillance team, who had followed them throughout. Rogan then pulled his weapon, displayed his badge, and placed the occupants of the car and Sponseller under apprehension. Shortly thereafter, Rogan found appellant, who had fled the scene, in a nearby shop where he too was taken into custody.

Subsequently appellant took the witness stand and contradicted Rogan's version of the events on every significant point. He testified that he was in the park that day to take pictures; that his meeting with Sponseller had not been planned; that he did not speak with Sponseller about the sale of drugs; and that, upon being introduced to Rogan, he talked with Sponseller and Rogan for five to ten minutes about the Army, the Air Force, and about Spain in general. Appellant firmly maintained that there was absolutely no conversation about drugs, either in the park or in Sponseller's car; that he was in the car only to get a ride home; and that Rogan, not himself, gave directions to Sponseller and finally instructed Sponseller to stop the car and park it. He explained that he had left the bar for a short time to shop in a shoe store. During this excursion, he did recall talking briefly with Technical Sergeant Brewer, one of the men subsequently apprehended in the white automobile, as Stokes was returning to the bar. However, he was emphatic in his denial that he had discussed the sale of drugs either during his absence from the bar or in his conversation with Sponseller and Rogan upon his return.

In rebuttal, and over defense objection, trial counsel was allowed to elicit from Rogan evidence of two statements by Sponseller and one by appellant himself which involved uncharged misconduct.[7] The follow-

---

7. During the government's case-in-chief trial counsel had attempted to offer some of this same evidence. In rejecting the evidence at that time because of "the possible inflammatory effect it may have on the jury," the military judge remarked that if appellant's "defense is

ing portion of the record reflects this testimony:

Q. Okay, Special Agent Rogan, would you tell us that conversation ensuing in the automobile with Sponseller?

A. Well, sir, while we were driving to the park, Sponseller told me that we were dealing with blacks who are at Torrejon, or allegedly had been at Torrejon, were now up in Zaragoza.

Q. Did you react to that?

A. Yes, sir; I got very nervous, because Special Agent Conn has been at Torrejon for several years, and we had just finished an investigation where we had talked to a good many blacks at Torrejon Air Base.

Q. Did you express your concern to Sponseller?

A. Yes, sir; I did.

Q. And what did Sponseller reply, if anything?

A. Sponseller replied something to the effect that he'd been dealing with this guy for a long time and that, he told me about a 10-kilo deal that had gone down with this same individual.

Q. Now, what individual was he talking about in the context of the conversation?

A. Sir, Tech' Sergeant Stokes, I believe.

Q. Did it appear he was talking about the individual you subsequently met at the park?

A. Yes, sir.

Q. Do you remember anything more about what he said about this prior deal?

A. Sir, he mentioned that the deal was set up to go in a cafeteria or restaurant, something to that effect, and that the deal went very smooth, and that there was no problems with it.

Q. I see. Then subsequent to that, you met Sergeant Stokes, is that right?

A. Yes, sir.

\* \* \* \* \* \*

Q. Now, you testified that certain conversations had occurred in that automobile on the way to the second bar; were there any conversations which you did not testify to last Friday?

A. Yes, sir; there were.

Q. Okay, at this point in time I'd like you to reiterate to the court those things which were said and who said them that___

A. Tech' Sergeant Stokes indicated that a friend of his had been busted recently and that things were hot at Zaragoza, and that he didn't want to be busted. And he mentioned that he was going to do several more deals and then quit, because he was about ready to leave the area.

Q. He said he was about to leave the area?

A. Yes, sir.

Q. Did Sponseller say anything else in the car that you didn't testify to the other day?

A. Yes, sir. They were, they were both trying to get me to deal, and Sponseller was saying that he'd dealt with this fellow, meaning Tech' Sergeant Stokes, again and again.

Q. And did he say anything about those deals, other than that? Did he say whether they worked or didn't work?

A. Yes, sir; he said the deals all went smoothly, he'd never had any problem with it. We, Sponseller and Stokes were both trying to get me to deal. Stokes—or, Sponseller, on the way to the park, just to get me to relax, I guess, because the news that we were dealing with people that we could possibly know, both myself and Special Agent Conn, was really devastating to me. I saw some real problems there. He mentioned that when the deal happened in the park, that he would take us back to the apartment, weigh the hashish, and if

that there was no conspiracy, then that may well trigger the admissibility of former deals between Sponseller and the accused, in which case then you could go into detail."

the hashish was less than five kilos, he'd make up the difference in the amount of hashish.

After Rogan's testimony, the military judge gave the court members these limiting instructions as to its use:

> This evidence may be considered only for the limited purpose of its tendency to prove a plan or design of the accused, that is, to prove that Sergeant Stokes was an active participant with Tech' Sergeant Brewer, Airman First Class Sponseller, and Mr. Rivero in the alleged plan to sell the 4.75 kilograms of hashish to Special Agent Rogan on 1 June; secondly, to prove that the accused was conscious of or aware that an alleged sale of hashish to Special Agent Rogan was being negotiated on 1 June 1978; and thirdly, to rebut the expressed contention of the accused that his presence at the scene of the alleged offenses was the innocent result of accidental fate, or that is more particularly, that he was at the scene of the alleged offenses merely because of his acquaintanceship with Sponseller and his acceptance of a ride home.
>
> This evidence may be considered for no other purpose whatsoever. You may not infer from such evidence that Sergeant Stokes has an evil disposition or criminal propensities, and that he therefore committed the offenses charged. You must disregard the evidence except for the limited purposes I have outlined, and you must disregard the evidence of other uncharged misconduct completely.

Similar instructions were rendered again during the general instructions preceding deliberations on the findings.

### B

Paragraph 138*g*, Manual, *supra*, articulates the generally prevailing "rule . . . that evidence of other offenses or acts of mis- conduct of the accused is not admissible as tending to prove his guilt, for ordinarily this evidence would be useful only for the purpose of raising an inference that the accused has a disposition to do acts of the kind charged or criminal acts in general," and thus it would violate the rule that no inference of guilt may be drawn from evidence of an accused's bad character. The provision expressly recognizes, however, that such evidence *is* admissible if it "has substantial value as tending to prove something other than a fact to be inferred from the disposition of the accused or is offered in proper rebuttal of matters raised by the defense." The Manual then lists and discusses seven examples of circumstances in which evidence of other offenses or acts of misconduct is admissible.

In this Court the Government relies on these four examples to support the military judge's rulings which allowed the evidence disclosing appellant's uncharged misconduct: (1) "When . . . [the evidence] tends to prove a plan or design of the accused" (para. 138*g*(2)); (2) "When it tends to prove knowledge or guilty intent in a case in which these matters are in issue" (para. 138*g*(3)); (3) "When it tends to show the accused's consciousness of guilt of the offense charged" (para. 138*g*(4)), and (4) "When it tends to rebut a contention, express or implicit, made by the accused that his participation in the offense charged was the result of accident or mistake or was the result of entrapment" (para. 138*g*(6)).[8] In any event, the Manual's list is illustrative, not exhaustive, as to the circumstances in which evidence of an accused's uncharged misconduct may properly be admitted. *United States v. Thomas*, 11 M.J. 388, 393 (C.M.A.1981); *see United States v. Haimson*, 5 U.S.C.M.A. 208, 226–27 n.4, 17 C.M.R. 226–27 n.4 (1954). Indeed, the list is prefaced by the following clause: "*For instance,*

---

8. Mil.R.Evid. 404(b), which supplanted paragraph 138*g* on September 1, 1980, and which is virtually identical to Fed.R.Evid. 404(b), is substantially similar:

> (b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

evidence of other offenses or acts of misconduct of the accused is admissible in the following circumstances." (Emphasis added). The operative language in paragraph 138*g* is that which makes evidence of uncharged misconduct admissible if that evidence is probative of something other than an evil disposition on the part of the accused.[9]

In this case, as has been argued by the Government, the evidence concerning Sponseller's statements was admissible as part and parcel of the transaction charged. Indeed, in context, these statements clearly were uttered by Sponseller in the execution of the conspiracy to sell for the purpose of persuading Rogan—an apparently hesitant buyer—to proceed with the purchase on the sellers' terms. The rule limiting admissibility of uncharged misconduct does not shield an accused from the reception of evidence that he boasted of his past experience in crime in order to reassure a prospective vendee or co-worker of his skill and reliability.

Moreover, we conclude that no fair risk exists that Stokes could have been preju-

diced by any error in admitting this evidence. The primary sources of prosecution and defense evidence were, respectively, the testimony of Agent Rogan and of the appellant, who disagreed on virtually every important point. The verdict depended almost entirely on whom the members believed. If they believed Rogan, then there was more than enough evidence in the case-in-chief to persuade them of appellant's guilt, and the rebuttal testimony of Rogan would have added nothing to the equation. On the other hand, if they tended to believe appellant, nothing in Rogan's rebuttal testimony would have enhanced the credibility of his earlier testimony; he was no more believable after giving his rebuttal testimony than he was before. Under these circumstances, we cannot discern how appellant might have been prejudiced even if error had been committed.

## IV

The decision of the United States Air Force Court of Military Review is affirmed.

Judges COOK and FLETCHER concur.

---

9. This interpretation is consistent with Mil.R. Evid. 404(b), according to the analysis by the draftsmen of that rule. *See* App. 18, A18–61, Manual for Courts-Martial, United States, 1969 (Revised edition).