680

UNITED STATES

v.

**Richard R. FROSTELL, 367 60 6790, Corporal (E–4), U. S. Marine Corps.**

**NMCM 81 0580.**

U. S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 23 Aug. 1980.

Decided 16 April 1982.

CAPT Joseph M. Poirier, USMC, Appellate Defense Counsel.

LCDR Michael R. McGuire, JAGC, USN, Appellate Government Counsel.

Before CEDARBURG, C. J., and SANDERS and GORMLEY, JJ.

CEDARBURG, Chief Judge:

Contrary to his pleas, appellant was found guilty, at a general court-martial with members, of conspiracy to wrongfully introduce and transfer controlled substances in violation of Article 81, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 881. The panel of commissioned and enlisted members sentenced appellant to a dishonorable discharge, confinement at hard labor for 6 months, forfeiture of all pay and allowances, and reduction to E–1. The convening authority approved the sentence as awarded.

Appellant assigns eight errors for consideration by this Court. We deem it appropriate to address specifically assignments I, II, IV and VIII.

## I

In his initial assignment of error, appellant contends, as he did at trial, that his court-martial was barred by Article XVII, § 8 of the Status of Forces Agreement with Japan (SOFA).[1] Prior to his court-martial, appellant was convicted by Japanese authorities under an indictment alleging simple possession of 4.398 grams of powdered stimulant. The allegation made no reference to transfer of drugs or the participation of other individuals. In contrast, the charge referred to court-martial outlined three specifications of conspiracy to introduce and transfer controlled substances aboard Marine Corps Air Station, Iwakuni, Japan, with the participation of Japanese civilians and American service members. Evidence introduced at trial in support of appellant's claim of double jeopardy established that the drugs which formed the basis for the Japanese indictment initially had been obtained for distribution as part of the conspiracy. Appellant argues, based upon that factual link, that the Article XVII prohibitions are controlling. We reject appellant's argument, finding that the SOFA prohibition against successive prosecutions is inapplicable under the facts in the instant case.

While the defense of former jeopardy may support a motion in bar of trial, the Fifth Amendment protection against successive prosecutions traditionally has been limited to criminal proceedings brought by the same sovereign. *United States v. Stokes*, 12 M.J. 229 (C.M.A.1982). The defense has been expressly denied where the commission of certain acts constitutes an offense under the Code and a violation of foreign law. In such an instance, prosecution by the receiving state would not pre-

1. Article XVII, § 8 reads as follows:

 Where an accused has been tried in accordance with the provisions of this Article either by the military authorities of the United States or the authorities of Japan and has been acquitted, or has been convicted and is serving, or has served, his sentence or has been pardoned, he may not be tried again for the same offense within the territory of Ja-

 pan by the authorities of the other State. However, nothing in this paragraph shall prevent the military authorities of the United States from trying a member of its armed forces for any violation of rules of discipline arising from an act or omission which constituted an offense for which he was tried by the authorities of Japan.

clude a subsequent court-martial, absent some clear limitation by treaty or international agreement. Paragraph 215*b, Manual for Courts-Martial, 1969 (Rev.)* (MCM). Thus our inquiry narrows to whether appellant's court-martial for conspiracy falls within the prohibitions incorporated in Article XVII of SOFA.

██ Arising from a single chain of events, the charges confronting appellant at his court-martial and the Japanese prosecution were entirely distinct, both in their substantive elements and the societal interests addressed. As the United States Supreme Court repeatedly has noted,

> the test to be applied in determining whether these are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not. . . .

*Brown v. Ohio,* 432 U.S. 161, 166, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187, 194 (1979). *See also Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981); *Gavieres v. United States,* 220 U.S. 338, 31 S.Ct. 421, 55 L.Ed. 489 (1911); *Carter v. McClaughry,* 183 U.S. 365, 22 S.Ct. 181, 46 L. Ed. 236 (1901). The elements establishing simple possession and conspiracy to introduce and transfer are clearly dissimilar. The fact that the two charges arose from or were related to the same transaction would not be dispositive. *Stokes, supra* at 235. Assuming that each offense requires proof of a distinct element, the double jeopardy defense is inapplicable, notwithstanding a substantial overlap in the proof offered to establish each crime. *Brown, supra* 432 U.S. at 166, 97 S.Ct. at 2225. Moreover, evidence offered by the Government in opposition to the defense motion established that Japanese criminal law does not recognize conspiracy as a distinct criminal offense. Under the Japanese criminal system, a group of individuals who act in concert to accomplish a criminal purpose might expect a harsher sentence, yet acting jointly does not itself constitute a separate violation (except in certain instances not applicable to the offenses under consideration here).

██ It is settled law that conspiracy and a substantive offense encompassed by the agreement to conspire are distinct offenses, and thus a claim of double jeopardy would not provide a defense to convictions for both. *Pereira v. United States,* 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954). *Cf. United States v. Washington,* 1 M.J. 473 (C.M.A. 1976). Therefore, appellant's convictions by Japanese and military authorities fall outside the "same offense" proscription within Article XVII, and the defense motion was properly denied.

## II

Appellant's second assignment of error challenges the admission of several extrajudicial statements obtained by Japanese police. More specifically, appellant contends that his confessions were the involuntary product of inordinately harsh confinement and various threats and promises by Japanese authorities.

On 25 January 1980, appellant was apprehended by local authorities on suspicion of violating the Japanese Stimulant Control Law. Appellant immediately was confined in the Iwakuni police station, where he remained until his transfer to military control on 13 February. Uncontroverted testimony at trial established that, during this period, appellant's diet consisted of standard Japanese prison fare, supplemented by American C-rations. Appellant's shoes and socks were taken in accordance with Japanese custom, and the only heat in the cell area came from a kerosene heater located at the guard's station. Although provided with blankets, the heat from the single unit was inadequate to counter the chill in the cell. Appellant also testified that the toilet in his cell was both malodorous and unsanitary, because of a system which prevented a prisoner from flushing without assistance from a guard outside the cell.

Within two hours of his arrival at Iwakuni police station, appellant received a briefing on his SOFA rights from LTCOL [G], the judge advocate for the Marine Corps Air Station. LTCOL [G] explained that appellant could remain silent and was under

no obligation to provide police with a statement. Appellant was told, however, that if he was found guilty at trial, the Japanese judge would routinely consider a prisoner's cooperative attitude as a factor warranting leniency. Thus LTCOL [G] indicated:

> In discussing that further I point out that if the police have enough evidence to convict the man, it may be in his best interests to cooperate with them. If they do not, it may be in his best interests not to cooperate with them; but that in either case it's his decision to make. No one can order him to talk or require him to answer questions or make a statement, whether he does or does not want to.

LTCOL [G] further testified that he advised appellant that if prosecuted by the Japanese, appellant could not be tried by the military for the same offense, regardless of the outcome of the Japanese proceedings. While his recollection was somewhat vague, LTCOL [G] apparently made no comment concerning possible prosecution by the military for related offenses.

Appellant's recollection of that briefing was essentially the same. He specifically recalled, however, being told that "if the Japanese prosecute, the military will not be able to prosecute me." Those assurances were perceived by appellant as reaching any and all offenses.

The only other controverted facts centered on statements made by Japanese authorities during appellant's interrogations. During the first two or three days of his confinement, appellant refused to provide anything other than biographical information. According to appellant, the Japanese response was to explain the advantages to be gained by cooperation. Appellant testified that he was advised that if he was cooperative and truthful, that fact would be taken into consideration by the Japanese court in deliberating on sentence. Alternatively, the police interrogator warned that reticent behavior would result in a prison sentence of ten years and would force the police to employ an involuntary lie detector in court. Appellant, aware of the harsh reputation associated with the Japanese pe-

nal system, and fearing the threat of long confinement, chose to cooperate by providing inculpatory statements on 29 and 30 January, and 2, 3, 9, 12, and 19 February.

Testimony from the two Japanese interpreters present during the interrogations denied the use of threats or promises to extract the confessions. The interpreters stated that, while appellant was advised that cooperation might be a mitigating factor, similar information routinely was provided to anyone being questioned. The witnesses could not recall any comments regarding possible disposition in the absence of a confession or the possible use of a polygraph. Prior to each interview, appellant was advised of the suspected offense and of his right to remain silent. Each statement was translated into English and given to appellant for his review and possible modification. During the interviews, appellant was allowed to smoke, use the bathroom, and permitted to eat some of the C-rations provided. The interpreters denied the use of physical force or threats of physical abuse.

 The standards governing the voluntariness of a confession remain consistent, even where statements are taken by foreign authorities acting alone. *United States v. Jourdan*, 1 M.J. 482 (A.F.C.M.R. 1975), *aff'd*, 50 C.M.R. 917 (C.M.A.1975). The absence of American participation in the foreign investigation would negate the need for compliance with the warning requirements of Article 31, UCMJ, 10 U.S.C. § 831. *United States v. Jones*, 6 M.J. 226 (C.M.A.1979). Nevertheless, Article 31(d), UCMJ, requires that

> No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial.

A confession ultimately must be the product of free choice, uninfluenced by threats, promises, or physical or mental abuse. *United States v. Dalrymple*, 14 U.S.C.M.A. 307, 34 C.M.R. 87 (1968). Application of that standard will necessarily hinge upon

the totality of the circumstances established at trial. *United States v. O'Such*, 16 U.S.C. M.A. 537, 37 C.M.R. 157 (1967).

■ Considering the record in its entirety, we find that the circumstances surrounding appellant's incarceration and interrogation were not so coercive or intimidating as to render his extrajudicial statements involuntary. During the interrogations, appellant was permitted the necessary physical comforts. The interviews each lasted no more than two hours, which does not seem inordinately long given the need to translate the questions of the police investigator and appellant's responses. *See United States v. Talavera*, 2 M.J. 799 (N.C. M.R.1976), *aff'd*, 8 M.J. 14 (C.M.A.1976). While the conditions of confinement were rigorous, they do not seem unduly onerous nor is there any indication that appellant's treatment was unique.

■ Comments by the police, indicating that the Japanese judge would consider evidence of cooperation as a factor favoring leniency, apparently were correct and did not represent an unqualified promise of a specific disposition. Similar statements were employed by interrogators in *United States v. Carmichael*, 21 U.S.C.M.A. 530, 45 C.M.R. 304 (1972). There the Court of Military Appeals found no improper inducement where the accused was advised that his commanding officer would not understand his reluctance to confess and that a confession might result in trial by military authorities rather than a Chinese court. Improper influences during an interrogation would warrant suppression of any statements only where such influences acted as an inducement. *Carmichael, supra* at 533, 45 C.M.R. at 307. The evidence in the instant case establishes neither improper pressures nor an actual inducement to confess. *See United States v. Burns*, 47 C.M.R. 874 (N.C.M.R.1973).

While the police implied that cooperation would be considered along with all other evidence in extenuation, the clear impression was that the judge alone would determine sentence. The prospect of ten years imprisonment, if credible, might represent a threat sufficiently coercive to render a statement involuntary. Yet in this instance, each statement signed by appellant evidenced corrections and modifications over his signature, and were prefaced with an acknowledgement that the statement had been made voluntarily. Weighing the evidence as a whole, we find that the determination made by the trier of fact was supported by substantial evidence. On that basis, we affirm the ruling made at trial. *See Carmichael, supra; Burns, supra.*

## IV

■ At trial appellant moved to dismiss the charge and specifications thereunder, based upon a denial of his right to speedy trial. Appellant argued that his pretrial confinement in excess of 90 days constituted prejudice *per se*, and that based upon the "first prong" of *United States v. Burton*, 12 U.S.C.M.A. 122, 44 C.M.R. 166 (1971), dismissal was required. We have independently reviewed the record of trial and the briefs submitted by counsel, and find the assignment of error to be without merit.

Appellant was apprehended on 25 January by Japanese police in the exercise of their primary jurisdiction over drug offenses occurring off-base. Custody was transferred to military authorities on 13 February, accompanied by a Japanese request that appellant be confined at the Air Station correctional facility pending completion of the local prosecution. That request was honored on the same day by appellant's commanding officer. On 10 April, charges were preferred against appellant alleging violations of Article 81, UCMJ. A joint Article 32, UCMJ, investigation scheduled for 28 April was postponed after one of appellant's co-accused requested civilian counsel. The Article 32 hearing eventually was held on 16 May, resulting in a record comprising 105 pages and 60 exhibits. Also on 16 May, appellant made a formal demand for speedy trial. Contemporaneously, the Japanese moved to complete their prosecution with trial sessions on 2 May, 23 May, and 6 June. Once local authorities concluded their proceedings on 6

June, appellant was removed from any form of restraint. A preliminary Article 39(a), UCMJ, 10 U.S.C. § 839(a), session was held on 18 July, at which time appellant moved for a continuance until 8 August. The defense requested on 4 August the presence of a CONUS witness, and thereafter withdrew an earlier request for appellant's father. Trial on the merits began on 21 August 1980.

The stipulated chronology of events introduced at trial establishes that appellant was in confinement at the Air Station correctional facility for a period of 108 days. The period from preferral of charges to trial on 21 August encompassed 133 days, and 63 days elapsed between appellant's request for trial and the Article 39(a) session on 18 July.

While appellant would make the military accountable for all confinement after 13 February, the date of his transfer to the base correctional facility, that contention conflicts with the decision in *United States v. Reed*, 2 M.J. 64 (C.M.A.1976). There, the Court of Military Appeals held that detention by civil authorities for civil offenses would not represent confinement for which the military was accountable. For purposes of determining accountability, the crucial consideration is the purpose underlying the confinement. Thus,

> while the military exercises some control to the extent it may elect to retain the accused, such control is in essence a judgment as to whether the military or civil offenses shall be tried first; when the judgment is exercised in favor of the civil offenses, the subsequent confinement is directly related to those offenses, not the military offenses.

*Id.* at 67. *See United States v. Stokes*, 8 M.J. 694, 696 (A.F.C.M.R.1979), *aff'd on other grounds*, 12 M.J. 229 (C.M.A.1982).

Restraint, in the case *sub judice*, was imposed only upon the request of the receiving state, and within the explicit guidelines set forth in COMNAVFORJAPAN-INST 5820.16A, which outlines American responsibility for insuring the presence of service members for trial in Japanese courts. While SECNAVINST 1640.10 specifically exempts from the Military Magistrate program those service members confined in connection with foreign criminal proceedings, appellant's commanding officer was required by local instruction to weigh similar, relevant factors in considering the Japanese request for continued confinement. The Japanese apparently considered restraint to be sufficiently necessary that the Chief Procurator recommended disapproval of appellant's request on 9 May for release from confinement. The later decision to place appellant on restriction in lieu of confinement was made only after securing the Chief Procurator's approval, and that restricted status was terminated upon completion of the Japanese prosecution on 6 June. *Cf. United States v. Stubbs*, 3 M.J. 630 (N.C.M.R.1977).

In this respect, the instant case is distinguishable from *United States v. Young*, 1 M.J. 71 (C.M.A.1975), where the accused remained in confinement even after an implied waiver of jurisdiction by the Japanese. The opinion in *Young* concluded that with the Japanese reluctance to intervene and exercise jurisdiction, any continued confinement would be attributed to the military. Yet, in the instant case, restraint was specifically requested by local authorities, was closely monitored by the Japanese Chief Procurator, and terminated once Japanese interest in appellant ceased.

In light of the objectives underlying appellant's confinement, the military's accountability for purposes of speedy trial began, not with the inception of confinement on 13 February, but rather with the preferral of charges on 10 April. *United States v. Ward*, 1 M.J. 21 (C.M.A.1975). *See United States v. Larner*, No. 74 1562 (N.C.M.R. 4 April 1974); *United States v. Cool*, No. 70 2061 (N.C.M.R. 29 October 1970). The absence of confinement sufficient to trigger the first prong of *Burton* requires that we consider whether there was a purposeful or oppressive design by the Government to delay the trial and whether the Government proceeded with reasonable diligence. *United States v. Parrish*, 17 U.S.C. M.A. 411, 38 C.M.R. 209 (1968).

From the stipulated chronology, it is clear that the instant case presented administrative hurdles which necessarily slowed the proceedings. While all Government witnesses remained at Iwakuni, the convening authority, the investigating officer, the military judge, and both counsel were all stationed on Okinawa. Further delay arose from the perceived necessity to obtain prior authorization for appellant's court-martial from the Secretary of the Navy, pursuant to JAGMAN § 0107e. Despite the contemporaneous prosecution by the Japanese, the Government continued to perfect its case, securing immunity for various prosecution witnesses and interviewing host nationals.

Once appellant requested speedy trial, the Government was required to proceed immediately or show adequate cause for further delay. *Burton, supra* at 128, 44 C.M.R. at 172. While a lapse of 63 days cannot be considered as going to trial immediately, the record demonstrates adequate justification for the delay involved. Under the circumstances, the lapse of time does not seem so inordinate as to be unreasonable and we find no evidence of oppressive design by the Government or specific prejudice to appellant. *See United States v. Wager*, 10 M.J. 546 (N.C.M.R.1980); *United States v. Hessling*, No. 75 2649 (N.C.M.R. 20 April 1976).

## VIII

Appellant, after his initial brief, filed a supplemental assignment of error. Relying on the decision recently rendered in *Cooke v. Orser*, 12 M.J. 335 (C.M.A.1982), appellant seeks to set aside the findings and sentence based upon a purported promise of immunity made by the Air Station judge advocate, LTCOL [G], during a briefing on appellant's rights under the Status of Forces Agreement. Appellant contends that his decision to cooperate with the Japanese investigation and his eventual confessions were prompted by assurances received from the command representative. That detrimental reliance, in turn, would preclude appellant's subsequent court-martial. From a review of the facts and holding in *Cooke*, it is clear that appellant's contention is without merit.

Dismissal was required in *Cooke* where the accused relied on a reasonable expectation of immunity created by representatives of the Air Force and his command, and where authorities knowingly exploited, rather than clarified, those misperceptions. The convening authority in *Cooke*, from the outset, contemplated an investigation consistent with potential prosecution, despite repeated assurances to the contrary made to the accused. Having moved beyond the neutral objective of assessing potential damage to national security, due process required that the convening authority and his legal representatives proceed in an orderly and fair manner in dealing with the accused. *Id.* at 344. Thus Judge Fletcher found a violation of due process where the command chose to exploit a misunderstanding which it initially created. Chief Judge Everett, in his concurrence, held that dismissal was appropriate where the command's legal representative promised the functional equivalent of immunity—administrative separation—and the convening authority ratified that promise through his silence.

In contrast, the representations cited by appellant in the case before us were wholly ministerial in nature. The Station judge advocate merely advised appellant of his SOFA rights and those actions which the military might take following resolution of any Japanese proceedings, as required by local instruction. While LTCOL [G] acknowledged that conviction by the Japanese would preclude a court-martial for the same offense, those comments were not meant to convey the impression that prosecution for other offenses would be barred. At the time of appellant's briefing, military authorities had purposely assumed a neutral position regarding possible court-martial, largely from a desire to avoid impinging upon the Japanese investigation. In that respect, the Station judge advocate's comments lack the duplicity evident in *Cooke*. Appellant was simply advised of his rights within the Japanese criminal system and the advantages to be gained from a decision to exercise or waive those rights. Any com-

ments directed at future action by military authorities were far too uncertain to constitute a tacit promise of immunity or to encourage false expectations on the part of appellant.

Consideration of appellant's remaining assignments of error reveals them to be without merit, and they are summarily rejected. We specifically find, having reviewed the record of trial and the attendant evidence in extenuation and mitigation, that a dishonorable discharge is not an inappropriate punishment, given appellant's role as the initiator and driving force behind the conspiracy established at trial.

Accordingly, the findings and sentence as approved on review below are affirmed.

Judge SANDERS and Judge GORMLEY concur.